## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SCHENKER AG, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| SOCIÉTÉ AIR FRANCE, | ) | |
| KONINKLIJKE LUCHTVAART | ) | |
| MAATSCHAPPIJ N.V., MARTINAIR | ) | |
| HOLLAND N.V., CARGOLUX | ) | |
| AIRLINES INTERNATIONAL S.A., | ) | |
| NIPPON CARGO AIRLINES CO., | ) | |
| LTD., ALL NIPPON AIRWAYS CO., | ) | |
| LTD., QANTAS AIRWAYS LIMITED, | ) | |
| and SAS CARGO GROUP A/S, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.     Plaintiff Schenker AG, on behalf of itself and as assignee of all relevant claims of its affiliated entities (collectively, "Schenker"), brings this federal antitrust action pursuant to the Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26: a) for damages Schenker suffered as a result of the violations of the federal antitrust laws by defendants, Société Air France ("Air France"), Koninklijke Luchtvaart Maatschappij N.V. ("KLM"), Martinair Holland N.V. ("Martinair"), Cargolux Airlines International S.A. ("Cargolux"), SAS Cargo Group A/S ("SAS"), Qantas Airways Limited ("Qantas"), Nippon Cargo Airlines Co., Ltd. ("Nippon Cargo"), and All Nippon Airways Co., Ltd. ("Nippon") (collectively, "Defendants"); b) for injunctive relief to protect Schenker's interest in competition in the market for Airfreight Shipping Services in the United States; and c) to deter future antitrust violations by Defendants.

2.     Schenker alleges the following upon information and belief based, *inter alia*, upon the investigation of counsel, including a review of:

a.     press releases, media reports, and pleadings filed and Plea Agreements entered in various criminal actions brought by the United States Department of Justice (the "DOJ"), including *United States v. Société Air France, et al.*, No. 08-cr-00181-JDB (D.D.C. July 22, 2008); *United States v. All Nippon Airways Co., Ltd.*, No. 10-cr-00295-JDB (D.D.C. Dec. 6, 2010); *United States v. Cargolux Airlines International S.A.*, No. 1:09-cr-00097-JDB (D.D.C. May 12, 2009); *United States v. Qantas Airways Limited*, 07-322 (D.D.C. Jan. 14, 2008); *United States v. SAS Cargo Group A/S*, No. 08-cr-00182-JDB (D.D.C. July 21, 2008); and *United States v. Martinair Holland N.V.*, No. 08-cr-00183-JDB (D.D.C. July 22, 2008);

b.     pleadings filed in various civil antitrust actions, including but not limited to, *In re Air Cargo Shipping Services Antitrust Litigation*, 1:06-md-01775 (JG) (VVP)

(E.D.N.Y.), *DPWN Holdings (USA) Inc. v. United Air Lines, Inc., et al.*, 11-cv-0564 (JG) (VVP) (E.D.N.Y.), *DPWH Holdings (USA) Inc. v. Air Canada, AC Cargo LP*, 13-cv-6399 (JG) (VVP) (E.D.N.Y.), and *Benchmark Export Services v. China Airlines Ltd.,* 10-cv-639 (JG) (VVP) (E.D.N.Y.); and

       c.     pleadings filed and orders entered in various antitrust proceedings in foreign jurisdictions, including but not limited to, *Australian Competition & Consumer Commission v. Qantas* [2008] FCA 1976 (Dec. 1, 2008), *Australian Competition & Consumer Commission v. Thai Airways International Public Company Limited* [2012] FCA 1434 (Dec. 14, 2012), *Australian Competition & Consumer Commission v. Martinair Holland N.V.* [2009] FCA 340 (Apr. 14, 2009), *Australian Competition & Consumer Commission v. Société Air France* [2009] FCA 341 (Apr. 14, 2009), *Australian Competition & Consumer Commission v. Japan International Co. Ltd.* [2001] FCA 365 (Apr. 11, 2011), Korean Fair Trade Commission, *Case Concerning a Cartel by 26 Air Freight Transport Businesses*, Case No. 2009-Kook-Ka-3104 (June 18, 2010), and *In the Matter Between the Competition Commission and British Airways PLC,* Case No. 2006Mar2215 (Competition Trib. of So. Africa).

### <u>NATURE OF THE ACTION</u>

     3.     This action arises from a secret and unlawful global conspiracy undertaken and engaged in by Defendants and numerous co-conspirator Airfreight Carriers (the "Cartel") during the period from late 1999 until 2006 and thereafter (the "Relevant Period") to fix, raise, maintain, and/or stabilize the prices of airfreight shipping services ("Airfreight Shipping Services"), including the prices for air cargo shipments to, from, and within the United States ("U.S. Airfreight Shipping Services"), through a number of mechanisms, including, *inter alia,* agreeing to levy inflated Surcharges, as defined below, and jointly agreeing to eliminate or prevent discounting or rebating of prices for U.S. Airfreight Shipping Services based on

Surcharge revenues.  Defendants and the Cartel acted in concert pursuant to an overarching conspiracy to artificially inflate the prices of U.S. Airfreight Shipping Services.

4.     At present, twenty (20) Airfreight Carriers, including all of the Defendants, have pleaded guilty to felony antitrust violations in the United States pursuant to an investigation by the DOJ into their participation in the price fixing conspiracy alleged in this Complaint.  Those Airfreight Carriers, including all of the Defendants, have also paid criminal fines totaling almost USD 1.75 billion.  Specifically, for example, on July 22, 2008, Air France and KLM pleaded guilty to the criminal charge of participating in a combination and conspiracy to suppress and eliminate competition by fixing cargo rates, including Surcharges and fees, charged to customers for Airfreight Shipping Services, including U.S. Airfreight Shipping Services, beginning on or about May 15, 2001, and continuing until February 2006, the exact dates being unknown, in violation of Section 1 of the Sherman Act.  Air France and KLM agreed to pay a total fine of USD 350 million, with USD 210 million attributable to Air France and USD 140 million attributable to KLM, as warranted fines based on the volume of United States commerce effected by Air France's and KLM's participation in the criminal conspiracy.

5.     In addition, each Defendant has reached a settlement in a civil antitrust action pending in this District, *In re Air Cargo Shipping Services Antitrust Litigation*, 1:06-md-01775 (JG) (VVP) (E.D.N.Y) ("*Air Cargo* Litigation"), pursuant to which the class of purchasers of U.S. Airfreight Shipping Services (the "*Air Cargo* Litigation Class") has alleged the same antitrust conspiracy involving U.S. Airfreight Shipping Services alleged herein.  The total amount of those settlements entered into by Defendants with the *Air Cargo* Litigation Class, from which Schenker excluded itself, is USD 188.43 million.  Schenker excluded itself from those settlements with Defendants Air France-KLM and SAS on January 18, 2011, and with

Defendants Cargolux, Nippon, and Qantas on May 24, 2011, in accordance with the opt out procedures ordered by the Court.

6.      Moreover, in a decision dated November 9, 2010 (Decision C (2010) 7694 final in case COMP/39.258) (the "Commission Decision"), the European Commission (the "Commission") decided definitively that various Defendants, including Air France, KLM, Martinair, Cargolux, Qantas, and SAS, as well as other members of the Cartel, violated the antitrust laws through the introduction and collection of Fuel and Security Surcharges and by engaging in other anticompetitive agreements contrary to European antitrust law.  As a consequence, the Commission imposed fines of EUR 799 million on certain members of the Cartel, including various Defendants named herein. Specifically, the Commission imposed the following fines, which include the reductions agreed upon by the Commission under the Commission's leniency program: Air France – EUR 182.92 million (includes a twenty (20) percent reduction); Cargolux – EUR 79.9 million (includes a fifteen (15) percent reduction); KLM – EUR 127.16 million (includes a twenty (20) percent reduction); Martinair – EUR 29.5 million (includes a fifty (50) percent reduction); Qantas – EUR 8.88 million (includes a twenty (20) percent reduction); and SAS – EUR 70.1675 million (includes the fifteen (15) percent reduction).

7.      Schenker brings this action:

        a.      to recover the damages it suffered as a direct consequence of Defendants' violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, trebled, pursuant to Section 4 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. § 15;

        b.      to obtain injunctive relief against Defendants pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of the Sherman Act; and

      c.      to recover its costs of suit, including reasonable attorneys' fees and costs, and interest, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## DEFINITIONS

8.      "Airfreight Carrier" means any airline acting as an Airfreight Shipping Services provider, including Defendants herein.

9.      "Airfreight Customer" or "Freight Forwarder" means any person or entity purchasing Airfreight Shipping Services, including U.S. Airfreight Shipping Services, including but not limited to, Schenker, but excluding Defendants or any predecessor, subsidiary, or affiliate of any Defendant.

10.     "Airfreight Rate" is comprised of a "Base Rate," which represents the net freight rate and Surcharges. The net freight rate includes the costs that an Airfreight Carrier charges for providing Airfreight Shipping Services, including U.S. Airfreight Shipping Services, in order to cover all basic costs except, for example, Fuel and Security Surcharges (since the airfreight Cartel). The net freight rate that the Airfreight Carrier charges is based on the chargeable weight, which is either the actual weight or the volume (or dimensional) weight of the freight, depending which of the two is higher. Volume weight is used if the freight does not weigh much, but is awkwardly shaped or bulky and therefore takes up a disproportionately large amount of space for its weight (*e.g.*, foam padding).

11.     "Airfreight Shipping Services" means paid, private air transport of freight or other cargo by Airfreight Carriers.

12.     "Cartel" means the combination of Airfreight Carriers named as Defendants herein and their co-conspirators, including but not limited to, Lufthansa Cargo AG ("Lufthansa Cargo"), Air Canada, AC Cargo LP, Asiana Airlines Inc., Air China Limited, British Airways

PLC, Cathay Pacific Airways, S.A., Japan Airlines International Company Ltd., Korean Air Company, Ltd., LAN Airlines, Singapore Airlines, Swiss International Air Lines, Ltd., Thai Airways International Public Co., Ltd., and Viacão Aérea Rio-Grandense, S.A., that conspired during the Relevant Period to, *inter alia,* fix, raise, maintain, or stabilize the prices of Airfreight Shipping Services, including but not limited to, U.S. Airfreight Shipping Services, and including certain Surcharges levied by the Airfreight Carriers upon Airfreight Customers such as Schenker.

13.    "Fuel Surcharge" means the price collected by an Airfreight Carrier in order to cover additional fuel cost when the fuel price rises above a certain level.  As fuel prices have fluctuated since 1996, the Fuel Surcharge was introduced by Defendants and the other members of the Cartel as a separate fee from the Base Rate in order allegedly to respond to the unpredictable fuel cost fluctuations in a more proactive manner.  This Fuel Surcharge was levied by Airfreight Carriers, including Defendants, upon Airfreight Customers, including Schenker, purportedly to compensate the Airfreight Carriers for the increased costs of fuel.

14.    "Security Surcharge" means a Surcharge levied by an Airfreight Carrier, including Defendants and the other members of the Cartel, upon Airfreight Customers, including Schenker, purportedly to compensate the Airfreight Carriers for costs associated with security measures implemented by the Airfreight Carriers after the terrorist attacks in the United States on September 11, 2001.

15.    "Surcharges" are fees that generally were included in the Base Rate before the Cartel, but which were broken out from the Base Rate by the Airfreight Carriers as specific cost items and introduced as separate charges during the Relevant Period. The amount of the particular Surcharge was generally calculated based on the actual weight and not, like the net

freight rate, based on the chargeable weight. The most typical examples of Surcharges are the Fuel Surcharge and Security Surcharge, fees charged to an Airfreight Customer purportedly to compensate the Airfreight Carrier for external costs relating to their purchase of fuel and to security.

## THE PARTIES

16.     Schenker AG is a German corporation with its principal place of business at Alfredstrasse 81, 45130 Essen, Germany.   Schenker is the assignee of the legal right to prosecute and recover damages in this action on behalf of all of the Schenker affiliated companies that purchased U.S. Airfreight Shipping Services from Defendants during the Relevant Period.   Schenker is engaged in the business of providing, *inter alia*, logistics and freight forwarding services to its customers that require the transportation of goods within, to, and from the United States.   During the Relevant Period, Schenker directly purchased U.S. Airfreight Shipping Services, the price of which  included the price fixed Surcharges alleged in this Complaint, from each Defendant.

17.     Defendant Air France is a foreign corporation organized under the laws of France with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France.  Air France provides Airfreight Shipping Services throughout the world, including in the United States and this District.   Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from Air France during the Relevant Period.

18.     Defendant KLM is a foreign corporation organized under the laws of Netherlands with its headquarters located at P. O. Box 7700, 1117 ZL Schiphol, The Netherlands.  KLM provides Airfreight Shipping Services throughout the world, including in the United States and this District.   Schenker purchased millions of dollars of U.S. Airfreight

Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from KLM during the Relevant Period.

19.     Defendant Martinair is a foreign company with its headquarters located in 201 Haarlemmermeer, 118 CD Schiphol Airport, Amsterdam, The Netherlands.  Martinair provides Airfreight Shipping Services throughout the world, including the United States and this District. Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from Martinair during the Relevant Period.

20.     At the start of the Relevant Period, Air France and KLM operated as two separate, independent companies.  Beginning in May 2004, and continuing throughout the remainder of the Relevant Period, Air France and KLM were under common ownership by a single holding company known as Air France–KLM and began to integrate cargo operations outside the United States, although the two Airfreight Carriers have continued as separate subsidiaries and each Carrier retains its own separate brand.  In addition, during the Relevant Period, KLM was the majority shareholder of Martinair, acquiring 100% of its stock in December 2008.  Since that time, Martinair has been a wholly owned subsidiary of KLM.  Air France, KLM, and Martinair may be collectively referred to herein as "Air France-KLM."

21.     Defendant Cargolux is a foreign company with its headquarters located at Luxembourg Airport L-2990, Luxembourg, Grand Duchy of Luxembourg.  Cargolux provides Airfreight Shipping Services throughout the world, including in the United States and this District.  Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from Cargolux during the Relevant Period.

22.     Defendant Qantas is a foreign company with its headquarters located at Qantas Centre, 203 Coward Street, Mascot New South Wales 2020.  Qantas provides Airfreight Shipping Services throughout the world, including in the United States and this District. Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from Qantas during the Relevant Period.

23.     Defendant SAS is a foreign company with its headquarters located at Stockholm-Airlanda Kabinvägen 5 SE-195 87, Stockholm, Sweden.  SAS provides Airfreight Shipping Services throughout the world, including in the United States and this District.  Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from SAS during the Relevant Period.

24.     Defendant Nippon Cargo is a foreign company with its headquarters located at Onarimon Yusen Bldg. 11F, 3-23-5, Nishi-Shimbashi Minato-Ku, Tokyo 105-0003, Japan. Nippon Cargo provides Airfreight Shipping Services throughout the world, including in the United States and this District.  Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from Nippon Cargo during the Relevant Period.

25.     Defendant All Nippon is a foreign company with its headquarters located at Shiodome-City Center, 1-5-2, Higashi-Shimbashi, Minato-Ku, Tokyo 105-7140, Japan.  Nippon provides Airfreight Shipping Services throughout the word, including in the United States and this District.  Schenker purchased millions of dollars of U.S. Airfreight Shipping Services, the price of which included the price fixed Surcharges alleged in this Complaint, directly from

Nippon during the Relevant Period.  Nippon Cargo and All Nippon are collectively referred to as "Nippon."

26.    During the Relevant Period, Defendants provided a broad range of freight services to Airfreight Customers or Freight Forwarders, such as Schenker, throughout their respective systems and charged Airfreight Shipping Services Base Rates, Surcharges, and other fees to Airfreight Customers, including Schenker, in the United States and throughout the world.  Further, Defendants engaged in a continuous and uninterrupted flow of transactions in U.S. Airfreight Shipping Services that occurred in and involved United States interstate and import commerce.   In particular, Defendants marketed and sold U.S. Airfreight Shipping Services to Schenker and made shipments of goods on behalf of Schenker in United States commerce, for which Services Schenker paid in excess of USD 770 million between 2000 and 2008.

27.    During the Relevant Period, Defendants' conduct and that of the Cartel affected the flow of such commerce to Airfreight Customers of U.S. Airfreight Shipping Services, such as Schenker, and was intended to and did have a direct, substantial, and reasonably foreseeable effect on United States interstate and import commerce.

28.    As further alleged herein, during the Relevant Period, Defendants agreed, combined, and conspired with each other to fix, raise, maintain, and/or stabilize the prices of U.S. Airfreight Shipping Services by, *inter alia,* levying artificially inflated Surcharges and jointly agreeing to eliminate or prevent discounting or rebating of prices of U.S. Airfreight Shipping Services based on Surcharge revenues.  As a result of Defendants' unlawful conduct and conspiracy, Schenker paid artificially high prices for U.S. Airfreight Shipping Services and has suffered substantial injury to its business and property thereby.  As participants in the

Cartel, Defendants are jointly and severally liable for all of the illegal, price fixed, overcharges on U.S. Airfreight Shipping Services paid by Schenker during the Relevant Period.

29.     The acts alleged herein taken by Defendants, the Cartel, and each of the co-conspirators were fully authorized by each Defendant, the Cartel, and those co-conspirators, or ordered or done by duly authorized directors, officers, managers, agents, employees, or representatives of each Defendant, Cartel member, and co-conspirator while actively engaged in the management, direction, or control of that entity's affairs.

## JURISDICTION AND VENUE

30.     Schenker's claims for injuries as alleged herein and as sustained by reason of Defendants' violations of Section 1 of the Sherman Act are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including Schenker's reasonable attorneys' fees and costs.

31.     This Court has original federal question and specific jurisdiction over the Sherman Act claims asserted pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

32.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), since, during the Relevant Period, one or more of the Defendants resided, transacted business, was found, or had agents in this District, and a substantial part of the events giving rise to Schenker's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.  Defendants also inserted products or services in the stream of commerce that were intended to and did reach this District.

## FACTUAL ALLEGATIONS

### Background of the Airfreight Shipping Business

33.     The airfreight business, a growth market, involves and relates to the commercial shipment of goods via air transport.  This business has played a large role in the economies of the United States and other countries since the dawn of civil aviation in the 1950s, as letters and rush packages, in particular, were sent via airplane. With the rise in passenger traffic, airfreight was increasingly transported in the cargo holds of planes (so-called "bellies").

34.     Air cargo services are provided "one way" from origin to destination, either directly or using an indirect route via one or more midpoints.  Because of the different demands on either side of a route, freight rates are also defined differently for each route.

35.     Most Airfreight Carriers provide air cargo services on a network-wide basis. Through interline and other arrangements with other Airfreight Carriers, they also offer air cargo services to or from airports which their own aircraft do not serve directly.  The networks of Airfreight Carriers extensively overlap such that there are various Air Carriers operating to and from any international airport.

36.     The costs of airfreight operations depend in large part on the cost of fuel. However, capital and the operating costs of airplanes, airport and navigation fees, ground handling fees, and the administrative expenses of airlines also have an impact on the cost structure. The transport costs per ton-kilometer for freight transport are determined by the type of transport, the flight route (particularly short or long-haul routes), and the capacity utilization of the airplane.

37.     The Airfreight Carriers, which provide Airfreight Shipping Services, including U.S. Airfreight Shipping Services, are mainly international airlines that transport airfreight from the departure airport to the destination airport. Within this provider group, a distinction can be

made between airlines with pure freight fleets (all-cargo airlines) and airlines with mixed fleets (combination airlines), which also transport airfreight in the cargo hold, or belly, of passenger aircraft. Airfreight Carriers regularly offer Airfreight Shipping Services to Freight Forwarders or Airfreight Customers, such as Schenker, which in turn offer to their customers the transport of goods as airfreight, including the associated services and formalities, such as the transport of goods from shippers to the departure airport and to recipients from the destination airport. In this arrangement, a shipper concludes a freight forwarding agreement with a Freight Forwarder, again such as Schenker, which in turn concludes an airfreight agreement with the Airfreight Carrier and purchases the required Airfreight Shipping Services.

38.     Defendants are exclusively Airfreight Carriers that provide Airfreight Shipping Services, including U.S. Airfreight Shipping Services, either as combination or as all-cargo airlines. For example, Cargolux was the world's largest all-cargo airline in 2006. Measured in terms of freight ton-kilometers, it is the tenth-largest provider of airfreight services overall.

39.     The Airfreight Shipping Services industry is a multibillion dollar industry effecting the global economy.  For example, in 2005, during the Cartel period, the industry involved USD 50 billion of commerce.  Approximately USD 10 billion of this commerce involved shipments to and from North America.

40.     Airfreight Shipping Services is a business that has exhibited substantial traffic volume growth over time, averaging 6.3% growth per annum from 2002 through 2005, for example.  Unlike other transport methods, such as road, rail, and water transport systems, air transport offers the advantage that goods can be transported long distances in a short amount of time.

41.     Airfreight Shipping Services, including U.S. Airfreight Shipping Services, are a fungible, commodity product such that Airfreight Shipping Services provided by any one Airfreight Carrier are readily substitutable for the Airfreight Shipping Services provided by any other Airfreight Carrier.  As a result, price is the primary factor driving the choice of Airfreight Customers, including Schenker, between various Airfreight Carriers.

### Defendants' Involvement in U.S. Commerce

42.     Throughout the Relevant Period, Defendants engaged in a continuous and uninterrupted flow of transactions and shipments in U.S. Airfreight Shipping Services that occurred in and involved interstate commerce, including United States interstate as well as import commerce.

43.     Defendants' unlawful activities and the unlawful activities of the Cartel, as described herein, took place within and affected the flow of interstate and import commerce to Airfreight Customers, including Schenker.  Defendants' unlawful activities and the unlawful activities of the Cartel had a direct, substantial, and reasonably foreseeable effect upon United States interstate and import commerce.

### 1996-1999:  The Airfreight Carriers' Fuel Surcharges

44.     Prior to the Relevant Period, competition in the airfreight services industry was putting downward pressure on the price of Airfreight Shipping Services, including in the United States, and Airfreight Carriers were concerned that prices would fall as a consequence of that competition, even though fuel costs were at the time increasing.

45.     Generally, and prior to the Relevant Period, Surcharges were part of the price of Airfreight Shipping Services, whereby Airfreight Carriers such as Defendants charge extra fees to Airfreight Customers, including Schenker, above and beyond the Base Rate which is typically priced by weight or volume, with the expressed intent of defraying certain external

costs of the Airfreight Carriers, but with the overall effect of increasing the prices of Airfreight Shipping Services.

46.     At the time the Airfreight Carriers' conspiracy relating to the Surcharges commenced, many Airfreight Carriers had similar Fuel Surcharge pricing systems in place, some of which were published, which, if independently implemented in a competitive market, would have been the foundation for the timing and amount of upward or downward pricing movements triggered by multiple factors, including spot fuel prices.

47.     In that regard, the International Air Transport Association ("IATA"), an airline industry trade association based in Montreal, Canada, of which Defendants and other Cartel members were members, had been monitoring the price of aviation fuel since before 1990 and had created a Fuel Price Index ("FPI" or "Index") based on the average of the spot price of aviation fuel in the "US Gulf" market, the "US West Coast" market, and various other markets around the world.[1]  IATA did so as its goals include the standardization and harmonization of international air traffic, including the standardization of rates and thus freight prices, the standardization of documents, and the preparation of guidelines for the transport of passengers and airfreight.  As of June 1996, IATA had set its Fuel Price Index at 100.[2]

48.     Defendants' collusive and anti-competitive activity had its origins in events which commenced in the second half of 1996 in conjunction with the price of aviation fuel rising.  In September 1996, IATA advised its Cargo Steering Group that the Fuel Price Index

---

[1]     *See DPWN/Holdings (USA), Inc. v. United Air Lines, Inc., et al.*, No. 11 CV 0564 (E.D.N.Y.) (JG) (VVP), Second Amended Complaint [ECF No. 54] ("*DPWN/United* Compl." ), at 10 and n.9: Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997).

[2]     *See DPWN/Holdings (USA), Inc. v. United Air Lines, Inc., et al.*, No. 11 CV 0564 (E.D.N.Y.) (JG) (VVP), Second Amended Complaint [ECF No. 54] ("*DPWN/United* Compl." ), at 10 and n.9: Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997).

had risen to 132 and "sought their views on the convening of a Special Fuel Conference," which it proposed for mid-December 1996.[3]

49.     In about October 1996, Lufthansa Cargo publicly announced that, starting on November 1, 1996, it would levy across its entire route network a Fuel Surcharge of USD 0.10, or the equivalent in local currency, per kilogram of air cargo carried (the "1996 Surcharge"). Lufthansa Cargo stated that the 1996 Surcharge would be dropped when the price of fuel returned to the level of July 1996.  On or shortly after that date, a number of other Airfreight Carriers, including, for example, Qantas, began to levy a similar 1996 Surcharge either across their entire networks or on particular routes.

50.     Then, on November 6, 1996, the Singapore Board of Airline Representatives Cargo Subcommittee ("Singapore BAR CSC") held an "extraordinary" meeting to discuss imposing a Fuel Surcharge.[4]  Air France, Nippon, Lufthansa Cargo, Qantas, and SAS, among others, attended the meeting.[5]

51.     Subsequently, on December 9, 1996, the Cargo Steering Group of the IATA Composite Fuel Conference held a special meeting "to determine what further action was to be taken" with respect to the increasing price of aviation fuel.[6]  Airfreight Carriers attending the meeting included Air France, Nippon, and SAS.[7]  According to the Minutes of the meeting,

---

[3]     *See DPWN/Holdings (USA), Inc. v. United Air Lines, Inc., et al.*, No. 11 CV 0564 (E.D.N.Y.) (JG) (VVP), Second Amended Complaint [ECF No. 54] ("*DPWN/United* Compl." ), at 10 and n.9: Agenda, IATA Cargo Committee, 9th Meeting, at 3 (Mar. 3, 1997).

[4]     *See DPWN/United* Compl., at 10 and n.12:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, Singapore Board of Airline Representatives (Nov. 6, 1996).

[5]     *See DPWN/United* Compl., at 10 and n.13:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, Singapore Board of Airline  Representatives, at 1 (Nov. 6, 1996).

[6]     *See DPWN/United* Compl., at 11 and n.14: Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).

[7]     *See DPWN/United* Compl., at 11 and n.18: Minutes, Special Meeting, Cargo Tariff Conferences Steering Group, at 4 (Dec. 9, 1996).

"events of the recent past [unsuccessful unilateral attempts to impose fuel surcharges] and the resultant market confusion, underline the need for carriers in the future, to develop concerted and co-ordinated industry action" under the auspices of an IATA conference.   Thus, the Airfreight Carriers understood that "concerted and co-ordinated industry action" was necessary to impose sustainable Fuel Surcharges.[8]   The Cargo Steering Group concluded that all members of the Cargo Tariff Coordinating Conference would meet again in January 1997 to further coordinate a joint course of action.[9]

52.   On January 13, 1997, the IATA Cargo Steering Group met to further discuss joint strategies in light of the increasing price of aviation fuel.[10]   Then, on January 14-16, 1997, there was a Special Composite Meeting of Cargo Tariff Coordinating Conferences of IATA in Geneva, Switzerland.   At the meeting, British Airways made the following submission to the Conference:

> Aviation fuel costs have risen significantly since mid 1996 and are still approx[imately] 40[%] above the base point established in July 1990.   Consequently urgent industry compensatory price increases are r[sic] required.
>
> We anticipate considerable debate at the meeting on the methodology used to secure price increases to offset fuel prices.   Invariably this will surround increases to rates (percentage or fixed increase per [kilogram]) and the old argument of IATA/market price differentials.   It will also include the methodology of establishing a separate surcharge perhaps as a due carrier charge and not in the actual price at all.   Perhaps we should consider a separate rating line as a hybrid between the two approaches.   The conference should be open minded to all approaches with the objective of securing a realistic and workable solution that win [sic] actually provide the neccessary [sic] revenue compensations to the industry that is clearly justified.   BA [British Airways] is open to all approaches – even a combination of the two may be appropriate provided theres [sic] is total transparency and understanding for both airlines and customers.

---

[8]   *See DPWN/United* Compl., at 11 and n.18: Minutes, Special Meeting, Cargo Tariff Conferences Steering Group, at 4 (Dec. 9, 1996).

[9]   *See DPWN/United* Compl., at 11 and n.19: Agenda, IATA Cargo Committee, 9th Meeting, at 24 (Mar. 3, 1997).

[10]   *See DPWN/Air Canada* Compl., at 14 and n.19: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 2-3 (Jan. 14-16, 1997).

If a separate charge solution is considered then it is essential for the conference to establish associated codes and application rules. *As a guide BA will be seeking across the board price increases of five (5) percent or in the case of fixed amounts increases of between USD0.05 and USD0.10 per [kilogram]* depending upon stage distance. . . [W]e propose that any agreed price increases should be effective 1Mar97.

We would also like the conference to consider a variable price "triggered" by an enabling resolution which would only come into effect if a base point was exceeded by a certain tolerance.[11]

53.    At the January 1997 meeting, several Airfreight Carriers initially opposed the proposed resolution to adopt "triggered" Fuel Surcharges.[12]  Five Airfreight Carriers believed that a Surcharge was unnecessary because any increase in fuel costs already had been recouped through increased passenger fares or through Base Rates.[13]  Four Airfreight Carriers opposed a flat per kilogram Surcharge because the proposed Surcharge did not differentiate between area and route.[14]  Another Airfreight Carrier wanted a percentage Surcharge, rather than the proposed cents per kilogram Surcharge.[15]  Other Airfreight Carriers proposed increases in Base Rates, rather than a Surcharge.[16]

54.    In addition, members of the Conference were aware of the antitrust risks of their conduct.  The director of the IATA Legal Department addressed the attendees of the Special Composite Meeting as follows:

---

[11]    *See DPWN/United* Compl., at 12 and n.21: IATA, Submissions by Carriers, at 5 (Jan. 14, 1997) (emphasis added).

[12]    *See DPWN/United* Compl., at 13 and n.23: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997).

[13]    *See DPWN/United* Compl., at 13 and n.23: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997).

[14]    *See DPWN/United* Compl., at 13 and n.23: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997).

[15]    *See DPWN/United* Compl., at 13 and n.23: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997).

[16]    *See DPWN/United* Compl., at 13 and n.23: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 3-4 (Jan. 14-16, 1997).

Antitrust laws prohibit competitors reaching any form of agreement, understanding or arrangement which is likely to have an impact on price. As a general rule, competitors cannot discuss in any way the price they intend charging consumers. There are very few exceptions to this. The relevant exception is where immunity has been granted by the relevant authority for rates reached pursuant to a particular procedure and within the strict confines of the terms of the approval itself. IATA has such an approval for this conference. These immunities are very rare.

Without immunity, authorities regard with great suspicion any situation where competitors charge the same rate. In the event that there is any evidence whatsoever that competitors have had an opportunity to communicate in any way, and charge the same rate, there is a very strong assumption that they do so having colluded.

Until the particular approval is granted for any rate agreed at this conference, that situation would apply. In other words, in my opinion, any airlines which moves to charge the rate which is agreed at this conference before government approval, and therefore antitrust immunity, is obtained, would fact a very strong evidential presumption that the rate being charged had been agreed between competitors and without antitrust immunity. The question is one of evidence.[17]

55.     Notwithstanding the antitrust risk and apparently recognizing that concerted action was necessary for Fuel Surcharges to be successfully imposed, attendees of the Conference pursued the recommendation to charge a Fuel Surcharge on a global basis, including on U.S. Airfreight Shipping Services. Those other attendees "developed" Resolution 116ss, which contained the mechanism by which the Airfreight Carriers would concertedly impose a Fuel Surcharge.[18]   The Fuel Surcharge would be tied to percentage changes in the spot price of aviation fuel as tracked by the IATA Fuel Price Index, which IATA benchmarked against the June 1996 average spot price of aviation fuel in five markets around the world (*i.e.*, IATA set its Fuel Price Index at 100 to represent the average spot price of aviation fuel in June 1996).

---

[17]     *See DPWN/Air Canada* Compl., at 15 and n.26: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 5-6 (Jan. 14-16, 1997).

[18]     *See DPWN/United* Compl., at 14 and n.29: Agenda, IATA Cargo Committee, 9th Meeting, at 25 (Mar. 3, 1997).

56.     Specifically, the Airfreight Carriers agreed that members of the IATA United Cargo Tariff Coordinating Conferences would implement a Fuel Surcharge of USD 0.10 (or the equivalent amount in local currency) per kilogram, regardless of the distance shipped, by March 1, 1997, provided the FPI remained above 110 (*i.e.*, spot prices remained ten percent above the June 1996 spot price).[19]   Thereafter, the Fuel Surcharge would remain in effect until the Fuel Price Index fell below 110.   If the Index continued to increase and reached 150, the Airfreight Carriers agreed they would convene a meeting of the IATA Cargo Tariff Conferences to discuss increasing the Fuel Surcharge.

57.     Twenty (20) Airfreight Carriers voted in favor of approving Resolution 116ss, while five (5) abstained and Lufthansa Cargo and Swissair opposed it (although Swissair later withdrew its negative vote).[20]   The Minutes of the IATA meeting record, *inter alia*, that:

> 31.1 There was discussion as to whether the members should pass a resolution (ultimately known as Resolution 116ss) adopting a fuel surcharge index and related mechanism for the imposition of fuel surcharges in specified circumstances and for specified amounts.
>
> 31.2 The members believed there was a "need to build an enabling facility into the package so that more expeditious and orderly industry action could be taken in the event of future fuel crises".
>
> 31.3 The terms of the resolution were formulated in the course of the discussion.
>
> 31.4 Lufthansa raised a number of concerns in relation to the resolution and in order to alleviate some of these concerns, the IATA Director, Legal Department was invited to give his opinion.
>
> *  *  *  *
>
> 31.5 Resolution 116ss was put to a vote and although there was almost unanimous support, it was not passed at the meeting due to negative votes from Lufthansa and

---

[19]   *See DPWN/United* Compl., at 14 and n.31: For this Resolution, the Fuel Surcharge would not apply in some countries.   Agenda, IATA Cargo Committee, 9th Meeting, at 25 (Mar. 3, 1997).   The Fuel Surcharge imposed in 2000 had no such limitation.

[20]   *See DPWN/United* Compl., at 15 and n.32: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences, at 10 (Jan. 14-16, 1997).

Swissair.   Swissair later withdrew its negative vote but Lufthansa maintained its negative vote due to the implications Resolution 116ss would have on Lufthansa's own established fuel surcharge.[21]

58.     Because there was not unanimous support for Resolution 116ss, it was defeated under IATA rules.  However, that was not the end of the Resolution.  On April 15, 1997, the Singapore BAR held an "extraordinary" meeting, which Air France, Cargolux, Lufthansa Cargo, Nippon, and SAS, among others, attended.[22]   The purpose of the meeting was "to find out member airlines' plans on the fuel surcharge .. . ."[23]   After a discussion about whether Lufthansa Cargo would withdraw its opposition from IATA's adoption of a Fuel Surcharge, the attendees engaged in a discussion about how "it [was] an opportune time for members to increase rates especially in high demand sectors" because the "market so far [had] been receptive to the fuel surcharge which [was] effectively a rate increase."[24]   The participants agreed that "member airlines should cooperate with one another, and ensure that a longer notice is served to announce any intentions or decisions that may impact the aircargo [sic] industry."[25]

59.     In April 1997, Lufthansa Cargo removed the 1996 Surcharge as fuel prices had returned to the level of July 1996.  Shortly following the removal of the 1996 Surcharge, however, Lufthansa Cargo requested the recirculation of Resolution 116ss to IATA members, with certain amendments, apparently recognizing the importance of making the Fuel Surcharge

---

[21]   *See DPWN/United* Compl., at 15 and n.34: Minutes, Special Composite Meeting of Cargo Tariff Coordinating Conferences (Jan. 14-16, 1997); Agenda, IATA Cargo Committee, 9th Meeting (Mar. 3, 1997).

[22]   *See DPWN/United* Compl., at 15 and n.35:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting (Apr. 15, 1997).

[23]   *See DPWN/United* Compl., at 15 and n.37:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997).

[24]   *See DPWN/United* Compl., at 16 and n.38:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997).

[25]   *See DPWN/United* Compl., at 16 and n.38:  Minutes, Extraordinary BAR Cargo Sub-Committee Meeting, at 2 (Apr. 15, 1997).

effective.  Resolution 116ss was passed by mail vote in August 1997 with the caution that the intended effective date of October 1, 1997, for the Resolution would only be declared when all known necessary government approvals were received.[26]

60.    In May 1998, the Airfreight Carriers participated in a Special Composite Meeting of a Composite Cargo Tariff Coordinating Conferences of IATA in Geneva, Switzerland.  The Minutes record that Resolution 116ss was discussed and note the following:

> [Resolution 116ss] could not be declared effective because of the outstanding approval of Argentina, India and USA ("required governments").  The US DoT had advised that they would not accept filing of this Resolution for approval unless accompanied by economic justification based on current prices which the US carriers were unable to provide.
>
> As with all traffic conference meetings, these [IATA] meetings had immunity from US anti-trust laws, *on the condition that all agreements were submitted for specific approval by the US authorities*.  IATA would submit the agreements to the DOT in accordance with this condition. In addition, IATA's Board of Governors had determined that any agreement reached at this meeting must not be put into effect prior to its declaration of effectiveness . . . .This ruling was contained in the Provisions for the Conduct of the IATA Traffic Conferences and must be complied with to ensure continued immunity.
>
> ... The Chairman clarified that until such time as economic justification was provided to the US DoT, and that authority approved the Resolution, it would not be declared effective.[27]

61.    In June 1999, representatives from Lufthansa Cargo, SAS, and Cargolux, among others, met to engage in a "Competitive Analysis," which included discussions about the

---

[26]    *See DPWN/United* Compl., at 16 and n.41: Agenda, IATA Cargo Committee, 10th Meeting, at 41 (Sept. 10, 1997); Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating Conferences (Aug. 12, 1997); *see also In the Matter Between the Competition Commission and British Airways PLC, et al.*, CC No. 2006Mar2215, at 13 (Comp. Trib. of So. Africa) (July 28, 2010) ("Competition Commission Compl.").

[27]    *See DPWN/United* Compl., at 17 and n.46: Memorandum from Director, Tariff Services, IATA, to Members Participating in Tariff Coordinating Conferences, at 10 (May 29, 1998) (emphasis added); *see also DPWN/Air Canada* Compl., at 19 and nn.44-48: IATA Application for Approval of Agreements by the Int'l Air Transport Ass'n to the U.S. Dept. of Transp., Docket OST-2000-6837-1 (Jan. 28, 2000).

competitive situation in the United States.[28]   Upon information and belief, the Airfreight

Carriers discussed implementing the Fuel Surcharge as set forth in Resolution 116ss.

62.     Between August 1997 (when Resolution 116ss was passed by the members of

IATA) and November 1999, the IATA Fuel Price Index calculated in accordance with

Resolution 116ss remained below 130, the trigger point for the first level of Fuel Surcharge

under Resolution 116ss.[29]   Because the IATA Fuel Price Index remained below 130, IATA did

not take steps to complete the required filing formalities with relevant governments, including

the U.S. Department of Transportation ("U.S. DOT"), for approval of Resolution 116ss.

Indeed, IATA did not submit Resolution 116ss to the U.S. DOT until early 2000, after the Fuel

Price Index exceeded 130 for the first time since IATA adopted the Resolution.[30]   IATA

nevertheless continued to publish the IATA Fuel Price Index to Airfreight Carriers.[31]

### Implementation and Course of the Cartel's Price-Fixing Conspiracy

63.     Beginning no later than December 1999, and continuing through the Relevant

Period, Defendants engaged in an ongoing and secret conspiracy with other Airfreight Carriers

to fix, raise, maintain, and/or stabilize prices of Airfreight Shipping Services, including U.S.

Airfreight Shipping Services, through a number of mechanisms, including concertedly levying

---

[28]   *See DPWN/United* Compl., at 18 and n.48: E-mail from Sales Manager, Asia and Australia, Lufthansa Cargo (June 23, 1999).

[29]   *See Australian Competition and Consumer Commission v. Société Air France* [2009] FCA 341, ¶¶ 29-30 (Fed. Ct. of Australia) (Apr. 14, 2009).

[30]   *See DPWN/Air Canada* Compl., at 19 and n.44: IATA, Application for Approval of Agreements by Int'l Air Transport Ass'n to DOT, Docket OST-2000-6837-1 (Jan. 28, 2000); *see also DPWN/United* Compl., at 17 and n.44: Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating conferences, at 1 (Aug. 12, 1997); *Australian Competition and Consumer Commission v. Société Air France* [2009] FCA 341, ¶ 30 (Fed. Ct. of Australia) (Apr. 14, 2009).

[31]   *See DPWN/Air Canada* Compl., at 19 and n.44: IATA, Application for Approval of Agreements by Int'l Air Transport Ass'n to DOT, Docket OST-2000-6837-1 (Jan. 28, 2000); *see also DPWN/United* Compl., at 17 and n.44: Memorandum from Director, Tariff Affairs and Conferences, IATA, to Members Participating in Tariff Coordinating conferences, at 1 (Aug. 12, 1997); *Australian Competition and Consumer Commission v. Société Air France* [2009] FCA 341, ¶ 30 (Fed. Ct. of Australia) (Apr. 14, 2009).

inflated Surcharges and jointly agreeing to eliminate or prevent discounting of prices of U.S. Airfreight Shipping Services, in violation of the antitrust laws of the United States and other jurisdictions.

64.     The Airfreight Carriers' stated justification for imposing the Surcharges was the recovery of increased costs.  However, during the Relevant Period, that stated justification was a pretext intended to conceal the existence of the Cartel.   During the Relevant Period, on information and belief, the Fuel and Security Surcharges that Defendants charged Schenker and other Airfreight Customers exceeded any incremental increases in fuel cost, net of hedging, and fuel-saving efficiency enhancements.

65.     Thus, as a direct result of the Cartel in which Defendants participated, Schenker was significantly overcharged by Defendants and the other members of the Cartel with regard to the Surcharges imposed during the Relevant Period for U.S. Airfreight Shipping Services.

### The Cartel's Conspiratorial Fuel Surcharge Activities

66.     In December 1999, the Fuel Price Index reached the trigger point for Fuel Surcharges.  Thus, beginning in at least December 1999, Defendants and the other members of the Cartel exchanged information regarding the Fuel Surcharge in furtherance of their illegal agreement to act in concert with one another to fix the prices of Airfreight Shipping Services, including U.S. Airfreight Shipping Services.[32]

67.     For example, on December 13, 1999, an SAS representative asked members of the Cartel "whether [they] would be considering adding a fuel surcharge to [their] prices now

---

[32]     *See, e.g.*, Order, Korean Fair Trade Commission, General Meeting, Resolution No. 2010-44-061, *Case Concerning a Cartel by 26 Air Freight Transport Businesses*, Case No. 2009-Kook-Ka-3104 (June 18, 2010) (Republic of Korea) ("KFTC Order"), at 24-26.

that the IATA index has passed the magic limit of 130?"[33]  As discussed below, all of the recipients of the e-mail, including SAS, soon added a Fuel Surcharge to their prices.

68.      Subsequently, in order to eliminate competition in setting the Fuel Surcharge portion of Airfreight Shipping Services prices, including U.S. Airfreight Shipping Services prices, Defendants continued to combine and conspire, through secret meetings and communications, to jointly agree on the factors triggering each pricing system, the resulting price change to be implemented upon the occurrence of those factors, and the timing of that change.  These meetings, communications, and agreements ensured that Defendants would act jointly upon those triggering factors and identify and correct deviations from the terms and timing on which they collusively agreed.

69.      This combination and conspiracy was coordinated by a core group of Airfreight Carriers including Air France, KLM, and Lufthansa Cargo, among others.  Geographically-oriented groups of Airfreight Carriers helped coordinate and monitor the Cartel on a local or regional basis.[34]  Among other things, Defendants and the other Cartel members secretly met, discussed, and agreed on the harmonization of the Fuel Surcharge; implementation of the Fuel Surcharge; extensions of the Fuel Surcharge; capping the Fuel Surcharge (by shipment or by weight); and refusing to discount the Fuel Surcharge to Airfreight Customers.  For example, on information and belief,  representatives of Air France and KLM attended a series of regular meetings of the JFK Airport Air Cargo Association in New York, New York, as did representatives of Cargolux, Lufthansa Cargo, and Nippon. During these meetings and others as

---

[33]      *See DPWN/Holdings (USA), Inc. v. Air Canada, et al.*, 13 CV 6399 (E.D.N.Y.) (JG) (VVP), Complaint ("*DPWN/Air Canada* Compl.") [ECF No. 1], at 20 and n.51: E-mail from Robert Skoog, SAS, to representatives of United Air Lines Inc. ("United"), Air Canada, Lufthansa Cargo, and VARIG (Dec. 13, 1999).

[34]      *See DPWN/Air Canada* Compl., at 10 and n.4: Email between Lufthansa employees; *see also Benchmark Export Services, et al. v. China Airlines, Ltd., et al.*, 10 CV 639 (E.D.N.Y.) (J6) (VVP), Class Action Complaint [ECF No. 1] ("*Benchmark* Compl."), at 32.

further described below, the Airfreight Carriers, including Defendants, discussed and coordinated their plans to charge Fuel Surcharges in accordance with a Fuel Surcharge methodology established by Lufthansa Cargo, agreeing that Lufthansa Cargo's Fuel Price Index would replace the IATA Index for the purpose of deciding when to increase Fuel Surcharges.[35] As a result of these actions, the Fuel Surcharges imposed by the Cartel members, including Defendants, moved during the Relevant Period in substantially parallel fashion.

70.     Defendants and the other members of the Cartel implemented their agreements regarding the Fuel Surcharge by privately exchanging price and cost information for the purpose of monitoring and enforcing any agreed-upon Fuel Surcharge levels and publicly announcing agreed-upon Fuel Surcharge increases in advance of their implementation in order to ensure coordination among Defendants on the Fuel Surcharge levels.  However, Defendants and the other members of the Cartel intentionally staggered changes in the Fuel Surcharges to avoid detection of the Cartel by giving Airfreight Customers the false impression that the Cartel members were acting unilaterally instead of collectively and collusively.

71.     The coordination of strategy of the Cartel members with respect to the introduction and collection of Fuel Surcharges first occurred in late 1999 at a Cartel meeting in Frankfurt, designated as a "coffee meeting," for which Lufthansa Cargo arranged invitations and which was attended by employees of Cargolux, Air France, and KLM, among others.  The participating Airfreight Carriers coordinated their strategy concerning a flat-rate Fuel Surcharge to be charged on all shipments.  They also agreed to inform one another about the introduction

---

[35]     *See Benchmark* Compl., at 32; *see also DPWN/United* Compl., at 71 and nn.335-36: Email from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swiss Air (Apr. 20, 2000); E-mail from a Swiss Air employee, to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000).

and continued collection of the Fuel Surcharge. Additional Airfreight Carriers, including certain Defendants, which were contacted by telephone, also joined the Cartel.

72.     Consistent with its role as one of the primary facilitators of the Cartel, Lufthansa Cargo played the lead role in monitoring Cartel prices and keeping them coordinated. As one Lufthansa Cargo employee told a representative of Japan Airlines, "[o]ne thing which I would not like to see is a competition and price war against each other. We have worked together for such a long time, to our mutual satisfaction, that I would like to see a joint approach [ ] continue."[36]

73.     Accordingly, and pursuant to the conspiracy, on December 28, 1999, Lufthansa Cargo publicly announced the introduction of a Fuel Surcharge following the concept and approach of Resolution 116ss, to which it made explicit reference in its public announcement. The Fuel Surcharge was USD 0.10 per kilogram, of net freight weight, or the equivalent in local currency, on its entire worldwide network effective February 1, 2000.[37]

74.     On January 5, 2000, GCCI held a "special meeting" at the Benissimo Restaurant to discuss the implementation of the Fuel Surcharge. Representatives of Air France, KLM, Cargolux, and Nippon, among others, attended the meeting. The stated goal of the GCCI was "to be able to interact, communicate and share helpful information."[38] Although GCCI claimed that "[t]he concentration of the meetings does not focus on the pricing/rates of each airline but

---

[36]     *See DPWN/United* Compl. at 62 and n.290:  E-mail from Senior Vice President of Sales, Lufthansa Cargo, to T. Fukuchi, Japan Airlines (June 8, 2001); *see also* E-mail from Senior Vice President Sales, Lufthansa Cargo, to Head of Sales for Hannover, Lufthansa Cargo (Sept. 14, 2001) (unofficial translation).

[37]     *See DPWN/Air Canada* Compl., at 20 and n.52:  Lufthansa Cargo News, *Lufthansa Cargo Introducing Fuel Surcharge Effective From February 2000 for the entire Route Network* (Dec. 28, 1999); Letter from Regional Manager Sales, Arabian Peninsula and Iran, Lufthansa Cargo to Customer (Dec. 29, 1999); Press Release, Lufthansa Cargo, *Lufthansa Cargo Announces Fuel Surcharge Increases* (Dec. 28 1999); *see also* Memorandum from Wolfgang Schmitz, Lufthansa Cargo (Jan. 7, 2000); Minutes, Lufthansa Cargo Executive Board Meeting (Dec. 21, 1999); Competition Commission Compl., at 15.

[38]     *See DPWN/United* Compl., at 19 and n.53: Minutes of Monthly Meeting, Global Cargo Carriers, Inc. (Jan. 27, 2000).

to discuss what is happening to the group and the industry," one of the key functions of GCCI was in fact to coordinate implementation of the Fuel Surcharge.[39]   Indeed, the purpose of the "special meeting" on January 5, 2000, was to discuss how to implement the Fuel Surcharge.[40]

75.    On January 11, 2000, representatives from Air France, KLM, Cargolux, Nippon, and SAS, among others, attended a "Market Analysis" meeting where, on information and belief, they further secretly discussed the Fuel Surcharge.[41]

76.    In accordance with the joint discussions set forth above, among others, various Airfreight Carriers in addition to Lufthansa Cargo started charging Schenker and other Airfreight Customers a Fuel Surcharge of USD 0.10 per kilogram in February 2000.[42]  These Airfreight Carriers included, but were not limited to, Air France, KLM, Cargolux, Qantas, and SAS.  The Airfreight Carriers intentionally staggered the implementation of the Fuel Surcharge to prevent detection of the Cartel by giving the impression that they were acting unilaterally.

77.    In the interim, on January 28, 2000 (after various Airfreight Carriers had announced the introduction of Fuel Surcharges following Resolution 116ss), IATA made a formal request to the U.S. DOT to approve Resolution 116ss.  On March 14, 2000, the U.S. DOT rejected Resolution 116ss, finding that the Fuel Surcharge mechanism contained in Resolution 116ss was "fundamentally flawed and unfair to shippers and other users of cargo air

---

[39]    See DPWN/United Compl., at 19 and n.56: Minutes of Monthly Meeting, Global Cargo Council, Inc., at 1-2 (Jan. 27, 2000).

[40]    See DPWN/United Compl., at 19 and n.57: Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 2 (Jan. 27, 2000).

[41]    See DPWN United Compl., at 19 and n.58: E-mail from Sales Manager, Asia and Australia, Lufthansa Cargo to representatives of, inter alia, United, Air France, Cargolux, and KLM (Jan. 11, 2000).

[42]    See DPWN/Air Canada Compl., at 22 and n.61: Chart, Lufthansa Cargo, Treibstoffzuschlag / Fuel Surcharge ab 01.02.2000 (Feb. 1, 2000); Chart, GCCI, Fuel Surcharge Update (Mar. 3, 2000); Chart, GCCI, Fuel Surcharge Update (Mar. 10, 2000); see also Press Release, Air France, Air France Cargo Implements Fuel Surcharge as from 1st February 2000 (Dec. 20, 1999); Press Release, Lufthansa Cargo, Lufthansa Cargo Announces Fuel Surcharge Increase (Dec. 28, 1999); Chart, American Airlines, West Texas Intermediate Crude: Historical Prices.

transportation" and would result in "unjustified and unwarranted rate increases."[43]   The U.S. DOT concluded that the Resolution was "adverse to the public interest and in violation of [Section 4.309 of Title 49 of the United States] Code."[44]

78.     Following the rejection of Resolution 116ss, on March 23, 2000, Cargolux and Lufthansa Cargo, among others, met at a GCCI meeting and discussed, among other things, an "UPDATE ON FUEL SURCHARGE."[45]   The Airfreight Carriers also held a "MARKET UPDATE," during which the attendees shared with each other competitively sensitive information, such as capacity and base-freight rates.[46]

79.     Then, at its April 4, 2000 Cargo Committee meeting in Vancouver, British Columbia, Canada, IATA announced it would no longer publish its Fuel Price Index.[47]   The Summary of Action arising from the meeting records the discussion in relation to the IATA Fuel Price Index as follows:

> Mr. Phil Sims (XB) provided an update on the fuel price index.  Resolution 116ss, which provided for an automatic rate increase mechanism triggered by a rise in an industry fuel price index, had recently been refused approval by the DoT.   As a result of this disapproval, IATA's legal advisers had recommended that the publication of the index should be suspended.   Members, however, felt that it was an extremely useful industry tool and requested that IATA Legal look into the matter further.

---

[43]   *See* Order, U.S. Dep't of Transp., Docket OST-2000-6837-2, at 2 (Mar. 17, 2000), *available at* http://1perma.cc/08ykrDUHXpg.

[44]   *See* Order, U.S. Dep't of Transp., Docket OST-2000-6837-2, at 2 (Mar. 17, 2000), *available at* http://1perma.cc/08ykrDUHXpg.

[45]   *See DPWN/United* Compl., at 24 and n.73: Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Mar. 23, 2000) (emphasis in original).

[46]   *See DPWN/United* Compl., at 24 and n.73: Minutes of Monthly Meeting, Global Cargo Carriers, Inc., at 1 (Mar. 23, 2000) (emphasis in original).

[47]   *See DPWN/United* Compl., at 22 and n.71: Summary of Action, IATA Cargo Committee, 14th Meeting, at 10 (Apr. 4, 2000); Memorandum from Senior Director, Tariff Services, IATA, to Members Participating in Cargo Tariff Coordinating Conference (Apr. 7, 2000).

Action: Secretary & IATA Legal[48]

Nonetheless, the Airfreight Carriers, including Defendants, continued to charge Fuel Surcharges as if the Resolution had been approved by the U.S. DOT.[49]

80.     On April 6, 2000, the Singapore BAR CSC held a meeting to discuss, among other things, the Fuel Surcharge.[50]   The Chairman "informed" the participants" "that BAR will not recommend a standard fuel surcharge for all airlines operating in Singapore as it would be construed by the CAAS, the shippers and the public that the airlines are common-pricing their cargo rates."[51]   In fact, however, the Cartel members continued to charge Fuel Surcharges that were substantially the same pursuant to the Cartel Agreement.

81.     On April 7, 2000, IATA sent a memorandum to the members of the Cargo Tariff Co-ordinating Conferences stating the following:

> As previously advised, Resolution 116ss has not received the requisite government approvals and will not be declared effective.  Accordingly, no purpose would be served by its continued circulation of this index and practice of doing so is being discontinued.[52]

82.     On April 14, 2000, IATA privately sent another memorandum to the members of the IATA Cargo Committee as follows:

> Dear Colleagues,

---

[48]   *See DPWN/United* Compl., at 22 and n.71:  Summary of Action, IATA Cargo Committee, 14th Meeting, at 10 (Apr. 4, 2000); Memorandum from Senior Director, Tariff Services, IATA, to Members Participating in Cargo Tariff Coordinating Conference (Apr. 7, 2000).

[49]   *See DPWN/Air Canada* Compl., at 26 and n.80: Agenda & Documentation, IATA Cargo Committee, 14th Meeting, at 2, 15 (Apr. 4, 2000).

[50]   *See DPWN/United* Compl., at 24 and n.79: Minutes, Singapore BAR CSC, at 1 (Apr. 6, 2000).

[51]   *See DPWN/United* Compl., at 24 and n.80: Minutes, Singapore BAR CSC, at 2 (Apr. 6, 2000); *see also DPWN/United* Compl., at 23 and n.72: Memorandum from Managing Director, Distribution Services, IATA, to Members, IATA Cargo Committee (Apr. 14, 2000).

[52]   *See Australian Competition and  Consumer Commission v. Société Air France* [2009] FCA 341, ¶ 33 (Fed. Ct. of Australia) (Apr. 14, 2009); *see also DPWN/United* Compl., at 22 and n.71: Summary of Action, IATA Cargo Committee 14th Meeting, at 10 (Apr. 4, 2000); Memorandum from Senior Director, Tariff Services, IATA, to Members Participating in Cargo Tariff Coordinating Conferences (Apr. 7, 2000).

We have had a significant number of appeals to maintain and continue to publish the IATA Fuel Index and have been examining how this could be done following the disapproval of Resolution 116ss by the US DoT. Our legal advisors' strong view is that IATA Members could be exposed to serious antitrust liability if we were to continue to publish the Index or to approach PLATTS or any other entity with a request to provide the Index, or if it was suggested to one or more carriers that they approach PLATTS in this regard. While it is recognized we cannot prevent carriers from doing so on their own initiative, we have to affirmatively advise against taking any such action, for the reasons stated below.

The Index has now become tainted by the DoT order finding Resolution 116ss, to which the Index was linked, to be adverse to the public interest and in violation of the law. If the carriers were to co-ordinate pricing by reference to the Index, whether pursuant to this disapproved Resolution or simply through de facto parallel pricing actions, that could be regarded as an illegal conspiracy in violation of applicable Competition laws, whether the Index is published by IATA, PLATTS, or indeed, simply calculated by each of the carriers independently. Against that background, IATA has no choice but to discontinue all activity associated with the disapproved Resolution, including calculation and dissemination of the Fuel Price Index, and it has done so. Because any further pricing actions linked to the now tainted Index could expose the carriers engaging in such pricing actions to serious antitrust liability, we must advise that carriers not engage in any pricing actions tied to the Index. As there is no further legitimate or lawful use to be made of the Index, we also recommend that carriers refrain from approaching any third party requesting them to calculate and publish the Index.

While we acknowledge the desire of many Members to have the Fuel Index published, we do believe the foregoing reflects a correct analysis of the situation. For the reasons expressed, the position being taken is designed to protect both Members and IATA from serious legal liability risk.[53]

83.   This April 14, 2000 correspondence was sent to the heads of cargo operations (members of the IATA Cargo Committee) at over sixty (60) Airfreight Carriers, along with their tariff coordinators (members of the Cargo Tariff Coordinating Conference). Many of those Carriers lobbied IATA through the Cargo Committee and IATA Legal to change this view. As a result of this distribution, however, all IATA Airfreight Carriers, including Defendants,

---

[53]     *See Australian Competition and Consumer Commission v. Société Air France, et al.* [2009] FCA 341, ¶ 24 (Fed. Ct. of Australia) (Apr. 14, 2009); *see also DPWN/United* Compl., at 23 and n.72: Memorandum from Managing Director, Distribution Services, IATA, to Members, IATA Cargo Committee (Apr. 14, 2000).

received the notice and thereby had brought to their attention the risks associated with the continued use of the IATA Fuel Price Index.[54]

84.     Notwithstanding IATA's correspondence before and following cessation of the publication of the IATA Fuel Price Index, Lufthansa Cargo started publishing on its website its own Fuel Price Index, which was substantially the same as the IATA Fuel Price Index, although it took different numerical values to insure that the Cartel agreement would not be discovered. Other Airfreight Carriers either secretly followed the Lufthansa Cargo Fuel Price Index, or published what purported to be their own Indexes.  In practice, all of the published Indexes resulted in coordinated increases of Fuel Surcharges, although the dates of increases were staggered to avoid exactly parallel conduct and, thus, hide the Cartel's price fixing activities.[55]

85.     To monitor adherence to the Cartel agreement, the Airfreight Carriers, including Defendants, met secretly and frequently and discussed their experience and plans with respect to implementing the Cartel agreement.  For example, on May 22, 2000, the core group of Cartel members, including Air France, British Airways, KLM, Lufthansa Cargo, and Swissair, held a "coffee round" at Lufthansa Cargo's meeting room in Toronto.[56]  Upon information and belief, the purpose of the "coffee round" meeting was to exchange competitively sensitive information to monitor the Cartel and prevent "cheating" on the Cartel.  Lufthansa Cargo coordinated pricing activity with that of the participants in the "coffee rounds," including Defendants.

---

[54]   *See Australian Competition and Consumer Commission v. Qantas Airways Limited* [2008] FCA 1976, ¶ 56 (Fed. Ct. of Australia) (Dec. 11, 2008).

[55]   *See Australian Competition and Consumer Commission v. Qantas Airways Limited* [2008] FCA 1976, ¶¶ 57-58 (Dec. 11, 2008).

[56]   *See DPWN/United* Compl., at 71 nn.335-36:  E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000);  *see also* E-mail from a Swissair employee, to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000).

86.     Subsequently, Lufthansa Cargo, Cargolux, Air France, and KLM agreed to increase the Fuel Surcharge from USD 0.10 per kilogram to USD 0.15 per kilogram as of November 1, 2000. Other Airfreight Carriers, including Qantas, also announced an increase in or the introduction of the increased Fuel Surcharge at about this time.[57] A few Airfreight Carriers, rather than simply applying Lufthansa Cargo's methodology, formulated their own methodologies. However, in each case, the methodology led to substantially the same outcome as that established by Lufthansa Cargo.

87.     In January and February 2001, in a further series of secret communications, the Airfreight Carriers continued to confer and collude with regard to the Fuel Surcharge. For example, on January 17, 2001, the Airline Cargo Council of Switzerland ("ACCS") met at the Unique Centre Airport in Zurich, Switzerland.[58] Lufthansa Cargo and other Airfreight Carriers, including KLM, attended.[59] One of the topics discussed was whether to decrease the Fuel Surcharge in accordance with the Lufthansa Cargo's FPI and Resolution 116ss when fuel prices dropped.[60] Ultimately, the Airfreight Carriers implemented, in a coordinated and largely parallel fashion (but with staggered implementation dates), this Fuel Surcharge decrease to maintain the Cartel.[61] Despite this decrease, the Fuel Surcharge still exceeded, and was

---

[57]     *See DPWN/United* Compl., at 25 and n.81: Press Release, United Airlines Cargo, *Fuel Surcharge Increase – U.S.A./Puerto Rico/Canada* (July 2000); *see also* Letter from Larry W. Schneider, Manager, Marketing & Freight Planning, TA, Qantas Airways Ltd., to Steve Concannon, Director of Strategic Alliance, Nippon Express USA, Inc., (May 10, 2000); E-mail between Lufthansa Cargo employees (Nov. 9, 2001) (unofficial translation).

[58]     *See DPWN/United* Compl., at 25 and n.82: Minutes, 27th ACCS Meeting (Jan. 17, 2001).

[59]     *See DPWN/United* Compl., at 25 and n.82: Minutes, 27th ACCS Meeting (Jan. 17, 2001).

[60]     *See DPWN/United* Compl., at 25 and n.82: Minutes, 27th ACCS Meeting (Jan. 17, 2001).

[61]     *See DPWN/United* Compl., at 25 and n.85: E-mail between Swissair employees (Feb. 26, 2001).

unnecessary to recover, the actual fuel-related costs of the Airfreight Carriers. Air France "unofficially confessed" to Swissair that it regretted decreasing the Fuel Surcharge.[62]

88.     On February 1, 2001, the Singapore BAR CSC held a meeting, which Air France, Cargolux, Nippon, and SAS, among others, attended.[63]   The Airfreight Carriers discussed the Fuel Surcharge.[64]   A further meeting to discuss and agree on the coordination of Fuel Surcharges was held on February 14, 2001, and attended by KLM and Lufthansa Cargo, among others.[65]

89.     On December 3, 2001, a United representative wrote to two Lufthansa Cargo employees.[66]   The e-mail referenced United's Alliance with Lufthansa Cargo, but also noted that Fuel Surcharges have not been limited to the Lufthansa-United Alliance, stating that "across the industry we have successfully implemented surcharges."[67]   The United e-mail further noted that, "although the surcharge was introduced to offset 'real' fuel costs, that revenue has contributed significantly to our falling revenues" and "bottom line and we are not prepared to lose it."[68]

90.     Then, in late 2001, the FPI fell to a level that, under Resolution 116ss, required that the Fuel Surcharge be suspended.   However, to preserve the supracompetitive profits

---

[62]   *See DPWN/United* Compl., at 25 and n.86: E-mail between Swissair employees (Feb. 26, 2001).

[63]   *See DPWN/United* Compl., at 25-26 and nn.88-90: Minutes, Singapore BAR CSC, at 1-2  (Feb. 1, 2001).

[64]   *See DPWN/United* Compl., at 25-26 and nn.88-90: Minutes, Singapore BAR CSC, at 1-2  (Feb. 1, 2001).

[65]   *See Benchmark* Compl., at 32.

[66]   *See DPWN/United* Compl., at 26 and n.92: E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001).

[67]   *See DPWN/United* Compl., at 26 and n.92: E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001).

[68]   *See DPWN/United* Compl., at 26 and n.94: E-mail from an Industry Affairs employee, United Airlines Cargo, to Lufthansa Cargo employees (Nov. 30, 2001) (emphasis added); *see also* All Cargo News, *UAL Cuts Cargo Fuel Surcharge to 10 Cts, Ups Inbound Rates, Jan 1* (Nov. 22, 2001); All Cargo News, *Swissair Says No Plans to Lower Cargo Fuel Surcharge* (Nov. 22, 2001) ("KLM and Northwest have both said they will scrap their cargo fuel surcharges on December 1, while United Airlines will cut its surcharge to 10 cents from 15 cents on January 1.").

generated by the Fuel Surcharge, the Airfreight Carriers engaged in a series of conversations about recalibrating the FPI mechanism so that the Fuel Surcharges would remain in effect. Lufthansa Cargo, SAS, Air France, and KLM, among others, were integrally involved in those discussions.[69]

91.     Thus, in January 2002, the Cartel members jointly agreed to and secretly initiated a modified Fuel Price Index mechanism.[70] The revised mechanism developed by the Cartel was benchmarked to the average spot price of aviation fuel in June 1996,[71] but had different thresholds for increases and decreases in the Fuel Surcharge.  It worked as follows:[72]

- FPI **exceeds 115** for 2 consecutive weeks: Fuel Surcharge implemented at USD 0.05/kg
- FPI **exceeds 135** for 2 consecutive weeks: Fuel Surcharge adjusted to USD 0.10/kg
- FPI **exceeds 165** for 2 consecutive weeks: Fuel Surcharge adjusted to USD 0.15/kg
- FPI **exceeds 190** for 2 consecutive weeks: Fuel Surcharge adjusted to USD 0.20/kg
- FPI **below 170** for 2 consecutive weeks: Fuel Surcharge reduced to USD 0.15/kg
- FPI **below 145** for 2 consecutive weeks: Fuel Surcharge reduced to USD 0.10/kg
- FPI **below 120** for 2 consecutive weeks: Fuel Surcharge reduced to USD 0.05/kg
- FPI **below 100** for 2 consecutive weeks: Fuel Surcharge suspended

92.     The Fuel Price Index mechanism was based on an understood, accepted, and precise methodology for the setting and applying on Fuel Surcharges in relation to the carriage of freight in the relevant market or markets which did not require the parties to the agreement to

---

[69]     *See DPWN/United* Compl., at 26 and n.91: E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (Jan. 15, 2002); *see also* Competition Commission Compl., at 15-16.

[70]     *See DPWN/Air Canada* Compl., at 28 and n.91: E-mail from General Manager for Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Jan. 25, 2002); Competition Commission Compl., at 16.

[71]     *See DPWN/Air Canada* Compl., at 28 and n.92: E-mail from General Manager for Pricing, Lufthansa Cargo, to a Lufthansa Cargo employee (Jan 15, 2002); E-mail from General Manager for Pricing, Lufthansa Cargo, to a Lufthansa Cargo employee (Jan 15, 2002); E-mail from General Manager for Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (Jan. 16, 2002).

[72]     *See DPWN/Air Canada* Compl., at 28 and n.92: E-mail from General Manager for Pricing, Lufthansa Cargo, to a Lufthansa Cargo employee (Jan 15, 2002); E-mail from General Manager for Pricing, Lufthansa Cargo, to a Lufthansa Cargo employee (Jan 15, 2002); E-mail from General Manager for Pricing, Lufthansa Cargo, to several Lufthansa Cargo employees (Jan. 16, 2002); *see also Australian Competition and Consumer Commission v. Korean Air Lines Co. Ltd.* [2011] FCA 1360, ¶¶ 39-40 (Fed. Ct. of Australia) (Nov. 30, 2011).

agree anew on such complex and detailed matters across a number of locations. The mechanism provided the following features, among others:

- a single Fuel Surcharge would be levied on the supply of air services;

- the Fuel Surcharge would be calculated on the weight of the cargo but would not be directly dependent on the distance the cargo was actually carried or the route used by the airlines concerned;

- the Fuel Surcharge would be levied at the origin of the cargo;

- the amount of the Fuel Surcharge would be fixed regardless of a particular carrier's actual costs; and

- where the goods were to be carried by a number of carriers, the entire Fuel Surcharge would be kept by the first carrier on a "swings and roundabouts" basis.[73]

93.     The uniform system for charging and applying Fuel Surcharges also assisted the international Airfreight Carriers in reaching agreements on Fuel Surcharges in diverse places as there was a common system with which they were all familiar. The effect of this was that, if a Fuel Surcharge was to be jointly imposed, the parties simply had to agree to the amount and the timing of implementation.[74]

94.     On January 23, 2002, Lufthansa Cargo publicly announced the new mechanism and methodology, pursuant to which it and other Airfreight Carriers, including Defendants, had agreed to impose Fuel Surcharges.[75]

95.     The Lufthansa Cargo methodology carried over from Resolution 116s and from Lufthansa Cargo's initial methodology, the calculation of Fuel Surcharges on actual per

---

[73]   *See Australian Competition and Consumer Commission v. Qantas Airways Limited* [2008] FCA 1976, ¶ 63 (Fed. Ct. of Australia) (Dec. 11, 2008).

[74]   *See Australian Competition and Consumer Commission v. Korean Air Lines Co. Ltd.* [2011] FCA 365, ¶¶ 47-49 (Fed. Ct. of Australia) (Nov. 30, 2011).

[75]   *See DPWN/United* Compl., at 28 and n.100: Lufthansa Cargo News, *Lufthansa Cargo introduces new fuel surcharge calculation method more closely linked to kerosene price/Risk remains with the airline* (Jan 23, 2002); E-mail between Lufthansa Cargo employees (Jan. 21, 2002) (pasting an announcement of Lufthansa Cargo's new FPI); *see also* Competition Commission Compl., at 17.

kilogram freight weight as well as the two week period for an index threshold to trigger a Fuel Surcharge increase or decrease, and was in other respects (other than trigger points) the same as Resolution 116ss and the Lufthansa Cargo initial methodology. In its press release announcing the new Fuel Price Index, however, Lufthansa Cargo misleadingly claimed that the new Index was "much more closely linked to the actual developments of fuel prices than the previous [Fuel Surcharge]" and "still leaves Lufthansa Cargo exposed to high financial risks arising from strongly fluctuating fuel prices."[76] In reality, unbeknownst to Schenker and other Airfreight Customers, the Fuel Surcharges imposed according to the new Fuel Price Index were not "linked" to fuel costs and Defendants and the other Airfreight Carriers were not "exposed to high financial risks" because the agreed-upon Fuel Surcharges over-recovered for any increases in fuel costs.

96.     Other Airfreight Carriers, such as Air France, KLM, and SAS, published Fuel Price Indices according to the new methodology initially proposed and utilized by Lufthansa Cargo.[77] Like the previous Lufthansa Cargo Fuel Price Index, certain of the new indices may have used different numbers than the new Lufthansa Cargo Index in order to give the false impression of unilateral action. For example, KLM published on its website its own Fuel Price Index during portions of the Cartel period. Thus, Schenker had the misimpression that KLM

---

[76] *See DPWN/United* Compl., at 28 and n.100: Lufthansa Cargo News, *Lufthansa Cargo introduces new fuel surcharge calculation method more closely linked to kerosene price/Risk remains with the airline* (Jan 23, 2002); E-mail between Lufthansa Cargo employees (Jan. 21, 2002) (pasting an announcement of Lufthansa Cargo's new FPI); *see also DPWN/Air Canada* Compl., at 29 and n.95: E-mail between Lufthansa Cargo employees (Jan. 21, 2002) (pasting an announcement of Lufthansa Cargo's new Fuel Price Index).

[77] *See DPWN/Air Canada* Compl., at 29 and n.96: E-mail between American Airlines employees (Aug. 15, 2005).

and the other Airfreight Carriers were imposing Fuel Surcharges independently and unilaterally.[78]

97.     Lufthansa Cargo began charging Airfreight Customers such as Schenker a new Fuel Surcharge pursuant to its new methodology on April 25, 2002, when the modified Index first exceeded 115 for two consecutive weeks.[79]   The other Airfreight Carriers also began charging Airfreight Customers, including Schenker, a Fuel Surcharge of USD 0.05 per kilogram pursuant to the new methodology.[80]   However, as was agreed upon by the Cartel members, including Defendants, the implementation dates were staggered to conceal their participation in the Cartel.   For example, co-conspirator British Airways implemented the Fuel Surcharge effective April 22,[81] co-conspirator Lufthansa Cargo effective April 25,[82] and KLM effective May 1.[83]

98.     Subsequently, in early September 2002, the new Fuel Price Index exceeded the relevant threshold for an increase in the Fuel Surcharge.   In response, there were communications among the Airfreight Carriers, including Defendants, confirming that they would increase the Fuel Surcharge.  For example, on September 19, 2002, the Air Cargo Agents

---

[78]    *See Australian Competition and Consumer Commission v. Korean Air Lines Co. Ltd.* [2011] FCA 1360, ¶ 41 (Fed. Ct. of Australia) (Nov. 30, 2011).

[79]    *See DPWN/Air Canada* Compl., at 30 and n.99: Lufthansa Cargo News, *Lufthansa Cargo to introduce Fuel Surcharge of 0.05 euros* (Mar. 28, 2002); Letter from Senior Vice President of Sales, Lufthansa Cargo, to Partners and Customers (Apr. 9, 2002).

[80]    *See DPWN/Air Canada* Compl., at 30 and n.100: Press Release, Air France Cargo, *Air France Cargo Introduced Fuel Surcharge Sliding Scale* (Mar. 26, 2002); Press Release, Air France Cargo, *Air France Cargo Announces Fuel Surcharge* (Apr. 5, 2002); Customer Newsletter, KLM Cargo (Apr. 3, 2002).

[81]    *See DPWN/Air Canada* Compl., at 31 and n.101: Newsflash, British Airways World Cargo, *British Airways World Cargo to Implement Fuel Surcharge* (Apr. 9, 2002); E-mail from Jassim Saif, Emirates (Apr. 9, 20002).

[82]    *See DPWN/Air Canada* Compl., at 31 and n.102: Lufthansa Cargo News, *Lufthansa Cargo to introduce Fuel Surcharge of 0.05 euros* (Mar. 28, 2002); Letter from Senior Vice President of Sales, Lufthansa Cargo, to Partners and Customers (Apr. 9, 2002).

[83]    *See DPWN/Air Canada* Compl., at 31 and n.103: Letter from KLM Cargo Management to Customer (Apr. 3, 2002).

Association of India held a meeting in the Air India conference room, "to discuss an increase in [the] Fuel Surcharge in view of [an increase in the] fuel price index . . . . There was an almost unanimous decision that the [Fuel Surcharge] would be increased" effective October 1, 2002.[84] Representatives Air France and KLM, among others, attended the meeting.[85]

99.   Thus, by mid-September 2002, in accordance with the new methodology and subsequent communications confirming the revised Cartel agreement, the Airfreight Carriers announced an increase in the Fuel Surcharge by USD 0.05 per kilogram to USD 0.10 per kilogram to be effective in late September or early October 2002.[86]  The Airfreight Carriers again staggered the implementation of this Fuel Surcharge increase to give the misleading impression that they were acting unilaterally.  For example, British Airways and Lufthansa Cargo increased their Fuel Surcharge to USD 0.10 per kilogram effective September 23,[87] while increases by Air Canada and KLM were effective October 1.[88]

---

[84]   *See DPWN/Air Canada* Compl., at 32 and n.110: Minutes of the Air Cargo Agents Association of India Meeting, at 2 (Sept. 19, 2002).

[85]   *See DPWN/Air Canada* Compl., at 32 and n.110: Minutes by the Air Cargo Agents Association of India Meeting, at 3 (Sept. 19, 2000); *see also Benchmark* Compl., at 33.

[86]   *See DPWN/United* Compl., at 30 and n.108: E-mail from Vice President for Central, Southern & Eastern Europe, Swiss WorldCargo, to ACCS Members (Sept. 11, 2002) (noting that United had confirmed that it would implement the Fuel Surcharge increase as of September 23, 2001); *see also* Press Release, British Airways World Cargo, *British Airways World Cargo to Increase Fuel Surcharge* (Sept. 6, 2002); Press Release, KLM, *KLM Cargo Introduces Fuel Surcharge and Security Surcharge Based on Actual Weight Per October 1st* (Sept. 16, 2002); Lufthansa Cargo News, *Lufthansa Cargo to introduce Fuel Surcharge of 0.10 euros per kilo of actual freight weight on September 23, 2002* (Sept. 5, 2002).

[87]   *See DPWN/United* Compl., at 30 and n.109: Newsflash, *British Airways World Cargo To Increase Fuel Surcharge* (Sept. 6, 2002); Lufthansa Cargo News*, Lufthansa Cargo to introduce Fuel Surcharge of 0.10 euros per kilo of actual freight weight on September 23, 2002* (Sept. 5, 2002); E-mail from Rolf Holderegger, Air Canada, to ACCS Members (Sept. 12, 2002); Newsletter, *KLM Cargo introduces fuel surcharge and security surcharge based on actual weight per October 1st* (Sept. 16, 2002).

[88]   *See DPWN/United* Compl., at 30 and n.109: Newsletter, *KLM Cargo introduces fuel surcharge and security surcharge based on actual weight per October 1st* (Sept. 16, 2002).

100.    On September 20, 2002, representatives from various Airfreight Carriers, including certain Defendants, met at a restaurant named "Freshen in Kolten."[89]   The attendees included Air France, KLM, and Lufthansa Cargo, among others.[90]   One of the primary discussion topics discussed was the Fuel Surcharge.[91]

101.    On September 25, 2002, in a restaurant named Yarachyang in Sogong-dong, Seoul, at a Board of Airline Representative Cargo Sub-Committee ("BAR") meeting hosted by Korean Airlines, a representative of Korean Airlines discussed that company's movement toward implementing Fuel Surcharges and sought other Airfreight Carriers' cooperation in its implementation of the Surcharges.  In response, other Cartel members attending the meeting, including Qantas, Air France, KLM, and Lufthansa Cargo, expressed their intent to cooperate, indicating that they would implement the same Fuel Surcharges as Korean Airlines.  In addition, Korean Airlines confirmed that it would notify other Airfreight Carriers of any changes pertinent to Fuel Surcharges, establishing an accord on implementation of Fuel Surcharges and exchange of information pertinent thereto.[92]

102.    Representatives of eight major Airfreight Carriers, including Air France, KLM, and Lufthansa Cargo, also met confidentially on September 30, 2002, in Japan to discuss their long term "status, plans and views regarding FSC [Fuel Surcharge]."[93]   All eight Airfreight

---

[89]      *See DPWN/Air Canada* Compl., at 33 and n.120: E-mail from Angelo Lassandro, IATA, to representatives from Air France, Air Canada, British Airways, Cathay Pacific, Emirates, Iberia, Lufthansa Cargo, Singapore Air, Swiss WorldCargo, and Thai Airways (Sept. 6, 2002).

[90]      *See DPWN/Air Canada* Compl., at 33 and n.120: E-mail from Angelo Lassandro, IATA, to representatives from Air France, Air Canada, British Airways, Cathay Pacific, Emirates, Iberia, Lufthansa Cargo, Singapore Air, Swiss WorldCargo, and Thai Airways (Sept. 6, 2002).

[91]      *See DPWN/Air Canada* Compl., at 33 and n.120: E-mail from Angelo Lassandro, IATA, to representatives from Air France, Air Canada, British Airways, Cathay Pacific, Emirates, Iberia, Lufthansa Cargo, Singapore Air, Swiss WorldCargo, and Thai Airways (Sept. 6, 2002).

[92]      *See KFTC Order*, at 28.

[93]      *See DPWN/United* Compl., at 29 and n.105: E-mail between Lufthansa Cargo employees (Sept. 30, 2002).

Carriers attending the meeting mutually agreed that there should be "no exceptions" to the imposition of the Fuel Surcharge because "[a]llowing one exception [would] defeat the whole industrial movement. This means, of course, no adjustments in net/net rates, either whole or partial."[94] In addition, the Airfreight Carriers established "[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and contradicting/misleading market information."[95]

103.    In accordance with the new methodology, the Airfreight Carriers, including Defendants, acted in concert by increasing the Fuel Surcharge by USD 0.05 per kilogram to USD 0.10 per kilogram effective on or about September 23, 2002.[96] The Airfreight Carriers staggered the effective date of this Fuel Surcharge increase, however, to convey the false impression to Schenker and other Airfreight Customers that the Carriers were acting unilaterally.[97]

104.    In February 2003, Lufthansa Cargo held discussions with Air France and KLM regarding increasing the Fuel Surcharge effective March 2003. Following these discussions, on February 17, 2003, Lufthansa Cargo announced that it would increase its Fuel Surcharge by

---

[94]    *See DPWN/United* Compl., at 29 and n.105: E-mail between Lufthansa Cargo employees (Sept. 30, 2002).

[95]    *See DPWN/United* Compl., at 29 and n.105: E-mail between Lufthansa Cargo employees (Sept. 30, 2002).

[96]    *See DPWN/United* Compl., at 30 and n.108: E-mail from Vice President for Central, Southern & Eastern Europe, Swiss WorldCargo, to ACCS Members (Sept. 11, 2002) (noting that United had confirmed that it would implement the Fuel Surcharge increase as of September 23, 2001); *see also* Press Release, British Airways World Cargo, *British Airways World Cargo to Increase Fuel Surcharge* (Sept. 6, 2002); Press Release, Lufthansa Cargo, *Fuel Surcharge* (undated); Press Release, KLM, *KLM Cargo Introduces Fuel Surcharge and Security Surcharge Based on Actual Weight Per October 1st* (Sept. 16, 2002).

[97]    *See DPWN/United* Compl., at 30 and n.109: Newsflash, *British Airways World Cargo To Increase Fuel Surcharge* (Sept. 6, 2002); Lufthansa Cargo News, *Lufthansa Cargo to introduce Fuel Surcharge of 0.10 euros per kilo of actual freight weight on September 23, 2002* (Sept. 5, 2002); E-mail from Rolf Holderegger, Air Canada, to ACCS Members (Sept. 12, 2002); Newsletter, *KLM Cargo introduces fuel surcharge and security surcharge based on actual weight per October 1st* (Sept. 16, 2002).

USD 0.05 per kilogram to USD 0.15 per kilogram effective March 3, 2003.[98]   The announcement and implementation of the increase to USD 0.15 per kilogram was previously coordinated by discussions and e-mails communications between the Airfreight Carriers, including among others, Air France, Cargolux, KLM, Lufthansa Cargo, Martinair, and SAS.[99] For example, in mid-February 2003, Lufthansa Cargo was discussing raising the Fuel Surcharge with various Airfreight Carriers, including KLM and Air France.[100]   Lufthansa Cargo's General Manager for Pricing wrote, "I have just spoken to KLM. ([Another Lufthansa Cargo employee] supplied me the name of the contact person there).  They also intend to announce on March 01 or 03. . . . SAS and United are also doing so."[101]

105.     Similarly, on February 18, 2003, an executive committee member of the Airline Cargo Counsel of Switzerland ("ACCS") advised another ACCS executive committee member of an urgent Fuel Surcharge meeting and reported that the final recommendation of Swiss International was a Fuel Surcharge increase to approximately USD 0.15/kg, effective March 3,

---

[98]   *See DPWN/United* Compl., at 30 and n.110: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation); E-mail between Lufthansa employees (Feb. 14, 2003) (certified translation) (cutting and pasting an e-mail from Otto Meyer, Air France); E-mail from General Manager of Pricing, Lufthansa Cargo, to Kenneth Marx, SAS Cargo (Feb. 17, 2003).

[99]   *See DPWN/Air Canada* Compl., at 35 and n.130: E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, LAN Cargo, SAS, Singapore Air, South African Airways, Thai Airways, United, and VARIG (Feb. 17, 2003); E-mail from Andre Berger, President, ACCS, to Air Canada, Air France, Alitalia, American Airlines, British Airways, Cathay Pacific, Federal Express, El Al Israel Airlines, Emirates, Iberia, Japan Airlines, KLM, Korean Air, Kuwait Airways, Lufthansa Cargo, Martinair, Saudi Arabian Airlines, Singapore Air, Swiss WorldCargo, TAP, Thai Airways, and United (Feb. 18, 2003); *see also* Minutes, India BAR Cargo Meeting (Oct. 8, 2003); Chart, Lufthansa Cargo, *Carrierzuschläge* (undated); Press Release, KLM Cargo, *KLM Cargo increases fuel surcharge to 0.20 cents, effective March 24, 2003 (*Mar. 11, 2003).

[100]   *See DPWN/United* Compl., at 31 n:113: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation); E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 13, 2003) (unofficial translation).

[101]   *See DPWN/United* Compl., at 35 and n.114: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Feb. 12, 2003) (unofficial translation).

2003, for shipments from Switzerland, including to the United States. The same day, the ACCS president advised the other ACCS members that there had been heavy discussion of the Fuel Surcharge and that he recommended following the Airfreight Carriers in implementing a new Fuel Surcharge of USD 0.15/kg for shipments from Switzerland, effective March 3, 2003. ACCS members, including Air France, Cargolux, Lufthansa Cargo, Martinair, and SAS, complied with ACCS' request and imposed identical Fuel Surcharge increases in March 2003 for shipments from Switzerland, including to the United States, albeit on a staggered basis.[102]

106.    The modified Fuel Surcharge mechanism agreed upon by the Airfreight Carriers did not envision the Fuel Surcharge exceeding USD 0.20 per kilogram. Therefore, to continue the Cartel, the Airfreight Carriers needed additional tiers, referred to "tiers," "thresholds" or "triggers," interchangeably, for changes in the Fuel Surcharge after the increase to USD 0.20 per kilogram was announced. Accordingly, Lufthansa Cargo persuaded the Airfreight Carriers to adopt two new tiers that would result in increases of the Fuel Surcharge to USD 0.25 per kilogram and USD 0.30 per kilogram if the Fuel Price Index exceeded certain thresholds.[103] Similarly, if the Fuel Price Index fell below certain thresholds, the Fuel Surcharge would return to USD 0.25 per kilogram or USD 0.20 per kilogram.[104] The Airfreight Carriers referred to these new tiers as triggers 5 and 6 (with triggers 1 through 4 as described above, already defined in the existing mechanism to which the Cartel members agreed in late 2001 and early 2002). At the same time, the Airfreight Carriers also added a lower tier to protect against the elimination of the Fuel Surcharge if the price of aviation fuel were to drop. As long as the Fuel Price Index

---

[102]    *See Benchmark* Compl., at 33.

[103]    *See DPWN/Air Canada* Compl., at 36 and n.132: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Mar. 11, 2003) (attachment).

[104]    *See DPWN/Air Canada* Compl., at 36 and n.132: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Mar. 11, 2003) (attachment).

remained above 100, a Fuel Surcharge of at least USD 0.02 per kilogram would be imposed.[105] The only way the Fuel Surcharge would be eliminated was if the Fuel Price Index fell below 100 (i.e., the average price of aviation fuel was below the 1996 average price of aviation fuel) for two consecutive weeks, which was a highly unlikely scenario.[106]  Subsequently, each time the then-highest tier was announced, the Airfreight Carriers would agree upon two additional tiers.[107]

107.    Lufthansa Cargo announced that it would increase its Fuel Surcharge by USD 0.05 per kilogram to USD 0.20 per kilogram effective March 24, 2003.[108]  Prior to the late-March increase, but before its effective date, on March 10, 2003, Lufthansa Cargo sent a pre-issue version of its press release in an e-mail jointly addressed to, among others, Air France, Cargolux, KLM, Martinair, and SAS.[109]  Thus, Lufthansa Cargo facilitated the Cartel, and the Cartel members, including Defendants, knew Lufthansa Cargo was doing so.

---

[105]    *See DPWN/Air Canada Compl.*, at 36 and n.132: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Mar. 11, 2003) (attachment).

[106]    *See DPWN/Air Canada Compl.*, at 36 and n.132: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Mar. 11, 2003) (attachment).

[107]    *See DPWN/Air Canada Compl.*, at 36 and n.136: Letter from Tom Wong, Chairman, Cargo Sub-Committee, Hong Kong Board of Airline Representatives, to Stephen Kwok, Assistant Director-General (Air Services), Civil Aviation Department, Hong Kong (Apr. 7, 2005) (announcing triggers 9 and 10).

[108]    *See DPWN/United Compl.*, at 32 and n.118:  Lufthansa Cargo News, *Continuing Rise in Crude Oil Prices Leads to New Increase in Fuel Surcharge* (Mar. 10, 2003); Customer Newsletter, KLM Cargo, *KLM Cargo Increases Fuel Surcharge, Effective March 24* (Mar. 11, 2003); Press Release, British Airways World Cargo, *British Airways World Cargo Increases Fuel Surcharge* (Mar. 13, 2003); Agenda , GCCI (Mar. 27, 2003) (showing Saudia charging USD 0.20 effective in April.)

[109]    *See DPWN/United Compl.*, at 32 and n.119:  E-mail from Regional Sales Director for Germany, Lufthansa Cargo, to representatives of United Airlines, Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAA, SAS, Singapore Air, Thai Airways, and VARIG (Mar. 10, 2003) (unofficial translation).

108.    Defendants and the other Cartel members announced the same increase to their Fuel Surcharge to be effective at approximately but not at the same time, thus conveying the impression to Schenker that the Airfreight Carriers were acting unilaterally.[110]

109.    In the interim, in a BAR meeting hosted by Korean Airlines on March 20, 2003 in Songong-dong, Seoul, a representative of Korean Airlines informed various representatives of the Cartel that it had filed a Fuel Surcharge approval  application and requested that other Airfreight Carriers implement Fuel Surcharges immediately after Korean Airlines attained that approval.  In response, other Carriers, including Defendants, expressed their intent to implement Fuel Surcharges, as already agreed in the BAR meeting of September 25, 2002.  The March 2003 BAR meeting was attended by, among others, representatives of Korean Airlines, Air France, KLM, and Lufthansa Cargo.[111]

110.    On April 1, 2003, as the price of aviation fuel was dropping, ten (10) Airfreight Carriers, including Air France, KLM, and Lufthansa Cargo, secretly met and discussed adjusting the Fuel Surcharge downward pursuant to the Lufthansa Cargo Fuel Price Index.[112]  In furtherance of the discussions at the April 1 meeting and according to the Fuel Surcharge triggers previously adopted and to minimize cheating, the Airfreight Carriers agreed to and did reduce their Fuel Surcharges in a coordinated and largely parallel manner by USD 0.05 per

---

[110]    *See DPWN/Air Canada* Compl., at 37 and n.139: Customer Newsletter, KLM Cargo, *KLM Cargo Increases Fuel Surcharge, Effective March 24* (Mar. 11, 2003); Lufthansa Cargo News, *Continuing Rise in Crude Oil Prices Leads to New Increase in Fuel Surcharge* (Mar. 10, 2003); Customer Newsletter, KLM Cargo, *KLM Cargo Increases Fuel Surcharge, Effective March 24* (Mar. 11, 2003); Press Release, British Airways World Cargo, *British Airways World Cargo Increases Fuel Surcharge* (Mar. 13, 2003); Letter from John Cooper, General Manager Freight Sales & Marketing, Qantas Airways, to Customers (Mar. 18, 2003); Press Release, British Airways World Cargo, *British Airways World Cargo Increases Fuel Surcharge* (Mar. 13, 2003).

[111]    *See* KFTC Order, at 30.

[112]    *See DPWN/Air Canada* Compl., at 37 and n.140: E-mail between Lufthansa Cargo employees (Apr. 2, 2003).

kilogram to USD 0.15 per kilogram effective in April 2003.[113]   Once again, however, the

Airfreight Carriers staggered their implementation dates to prevent detection of the Cartel.[114]

111.   Effective shortly thereafter, in early May 2003, the Airfreight Carriers again in a

coordinated and largely parallel fashion (with staggered effective dates) pursuant to the Cartel

agreement, reduced the Fuel Surcharge by another USD 0.05 per kilogram to USD 0.10 per

kilogram.[115]

112.   In early December 2003, the Fuel Price Index was rising, and it exceeded the

relevant threshold for a Fuel Surcharge increase.[116]   Lufthansa Cargo again served as a

facilitator and clearinghouse for communications between the Cartel Members, including but

not limited to, Defendants.  For example, Lufthansa Cargo's General Manager for Pricing noted

that he had coordinated an increase in the Fuel Surcharge with Cargolux, KLM, and SAS,

among others.[117]   Pursuant to their agreement, the Airfreight Carriers increased the Fuel

Surcharge by USD 0.05 per kilogram to USD 0.15 per kilogram effective in late December

---

[113]   *See DPWN/Air Canada* Compl., at 37 and n.141: Customer Newsletter, KLM Cargo, *KLM Cargo reduces fuel surcharge from Euro 0.20 to Euro 0.15, effective April 7, 2003* (Apr. 2, 2003); Press Release, Lufthansa Cargo, *Reduce Fuel Surcharge* (Apr. 8, 2003); Press Release, British Airways, *British Airways World Cargo Decreases Fuel Surcharge* (Apr. 10, 2003).

[114]   *See DPWN/Air Canada* Compl., at 37 and n.142: E-mail between Qantas Airways employees (Apr. 8, 2003).

[115]   *See DPWN/Air Canada* Compl., at 38 and n.143: Lufthansa Cargo News, *Lufthansa Cargo to reduce fuel surcharge to 0.10 euros from May 6 2003* (Apr. 22, 2003); Press Release, KLM Cargo, *KLM Cargo reduces fuel surcharge and adjusts Middle East network* (Apr. 25, 2003); Press Release, Martinair Cargo, *Martinair Reduces Fuel Surcharge* (Apr. 29, 2003); Press Release, Air France Cargo, *Fuel Surcharge* (May 1, 2003); E-mail between Swiss WorldCargo employees (Apr. 24, 2003) (pasting British Airways press release).

[116]   *See DPWN/Air Canada* Compl., at 38 and n.144: E-mail from Senior Vice President of Marketing, Lufthansa Cargo, to several Lufthansa Cargo employees (Dec. 4, 2003).

[117]   *See DPWN/United* Compl., at 34 and n.126: E-mail from General Manager of Pricing, Lufthansa Cargo, to Senior Vice President of Marketing, Lufthansa Cargo (Dec. 4, 2003);  *see also* E-mail between Lufthansa Cargo employees (Dec. 11, 2003); E-mail between Lufthansa Cargo employees (Dec. 4, 2003).

2003 or early January 2004.[118]   Once again, the effective dates of the increase were staggered. For example, Lufthansa Cargo implemented the increase to USD 0.15 per kilogram effective December 18,[119] Martinair December 19,[120] KLM January 1,[121] and Air France January 15.[122]

113.   In April 2004, the Fuel Price Index exceeded the next threshold, triggering another Fuel Surcharge increase.   This trigger led to another round of secret communications, coordinated as past by Lufthansa Cargo, between and among the Cartel members, including among others, Air France, KLM, Cargolux, Lufthansa Cargo, Martinair, and SAS.[123]   Part of Lufthansa Cargo's coordination included an e-mail jointly addressed to, among others, representatives of Air France, Cargolux, KLM, Martinair, and SAS.[124]

114.   Pursuant to the Cartel agreement and the communications between Cartel members in April 2004, the Airfreight Carriers announced—in a coordinated and largely

---

[118]   *See DPWN/Air Canada* Compl., at 38 and n.145: E-mail between Lufthansa Cargo employees (Jan. 12, 2004). *See also* Customer Newsletter, KLM Cargo, *KLM Cargo increases fuel surcharge to Euro 0.15* (Dec. 16, 2003); Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharge* (Dec. 8, 2003); Press Release, American Airlines Cargo, *American Airlines Cargo Division Announces Increase in Fuel Surcharge* (Dec. 3, 2003).

[119]   *See DPWN/Air Canada* Compl., at 38 and n.146: E-mail between Qantas Airways employees (Dec. 5, 2003).

[120]   *See DPWN/Air Canada* Compl., at 38 and n.147:   Press Release, *Martinair Cargo Increases Fuel Surcharge* (Dec. 8, 2003).

[121]   *See DPWN/United* Compl., at 34 and n.130:   Press Release, *KLM Cargo increases fuel surcharge to Euro 0.15* (Dec. 16, 2003).

[122]   *See DPWN/Air Canada* Compl., at 38 and n.149: E-mail between Swiss WorldCargo employees (Dec. 23, 2003).

[123]   *See DPWN/Air Canada* Compl., at 39 and n.151: E-mail from a Lufthansa Cargo employee to representatives of Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, EVA Air, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAS, Singapore Air, South African Airways, Thai Airways, United Airlines, and VARIG (Apr. 27, 2004).

[124]   *See DPWN/United* Compl., at 35 and n.134: E-mail from a Lufthansa Cargo employee to representatives of Air Canada, Air China, Air France, Air New Zealand, Cargolux, Cathay Pacific, EVA Air, Japan Airlines, KLM, Korean Air, LAN Cargo, Martinair, SAS, Singapore Air, South African Airways, Thai Airways, UA and VARIG (Apr. 27, 2004).

parallel fashion—an increase to USD 0.20 per kilogram to be effective in May 2004.[125]   The Airfreight Carriers' effective dates were once again staggered to prevent detection of the secret Cartel agreement.[126]   For example, KLM exchanged e-mails with other ACCS Members, indicating that KLM would follow the agreed-upon Fuel Surcharge increase, but with a slight delay.[127]   Thus, Lufthansa Cargo increased its Fuel Surcharge on May 10, 2004, while KLM increased its Surcharges on May 15, 2004.

115.   Shortly after the Cartel members announced the increase to USD 0.20 per kilogram, the Fuel Price Index moved above the next threshold.  Lufthansa Cargo coordinated the upcoming Fuel Surcharge thresholds with KLM and SAS, among others.[128]   Pursuant to the Cartel agreement, the Airfreight Carriers increased—in a coordinated and mostly parallel fashion—the Fuel Surcharge to USD 0.25 per kilogram in effective in early June 2004.[129]   These increases were staggered by the Cartel members, thereby concealing from Airfreight Customers such as Schenker, the coordinated nature of the increases.[130]

---

[125]   *See DPWN/Air Canada* Compl., at 39 and n.153:   Press Release, KLM Cargo, *KLM Cargo increases fuel surcharge to GBP 0.13* (Apr. 29, 2004); Press Release, Martinair Cargo, *Martinair Cargo increases its Fuel Surcharge* (Apr. 29, 2004).

[126]   *See DPWN/Air Canada* Compl., at 39 and n.153: Lufthansa Cargo News, *Lufthansa Cargo increases fuel surcharge* (Apr. 26, 2004); Press Release, KLM Cargo, *KLM Cargo increases fuel surcharge to GBP 0.13* (Apr. 29, 2004); Press Release, Martinair Cargo, *Martinair Cargo increases its Fuel Surcharge* (Apr. 29, 2004); Press Release, *Saudi Arabian Airlines Fuel Surcharge Increase* (Apr. 29, 2004); E-mail from Matthew Kemp, British Airways (Apr. 28, 2004).

[127]   *See DPWN/United* Compl., at 35 and n.135: E-mail from Susanne Erb, KLM Cargo, to ACCS Members (Apr. 27, 2004); E-mail from Mike Fuchs, Martinair, to ACCS Members (May 3, 2004).

[128]   *See DPWN/United* Compl., at 36 and n.141:  E-mail from General Manager of Pricing, Lufthansa Cargo, to Lufthansa Cargo employee (May 19, 2004).

[129]   *See DPWN/Air Canada* Compl., at 39 and n.154: E-mail between Lufthansa Cargo employees (June 7, 2004). *See also* Lufthansa Cargo, *Fuel Surcharge Competitor Overview,* at 2 (June 28, 2004).

[130]   *See DPWN/Air Canada* Compl., at 39 and n.155: Lufthansa Cargo News, *Lufthansa Cargo increases fuel surcharge* (May 24, 2004); Press Release, *Martinair increases Fuel Surcharge* (June 1, 2004); E-mail from MatthewKemp, British Airways, to Debbie Sykes, Qantas Airways (May 26, 2004); Press Release, Air France Cargo, *FSC Anpassung* (July 26, 2004); Customer Newsletter, *KLM Cargo increases fuel surcharge to Euro 0.25* (July 23, 2004).

116.     By mid-June 2004, the Fuel Price Index was increasing so quickly that it exceeded another threshold, indicating that the Fuel Surcharge should be increased to USD 0.30 per kilogram. Concerned that increasing the Fuel Surcharge too often and too quickly might reveal the existence of the Cartel, the Airfreight Carriers, after discussions among themselves, agreed to keep the Fuel Surcharge at USD 0.25 per kilogram.[131]

117.     In the BAR meeting hosted by Korean Airlines on June 30, 2004, in Sogong-dong, Joong-gu, Seoul, however, a representative of Korean Airlines advised other Cartel members of its plan to add the maximum limit in the Fuel Surcharge calculation methodology in accordance with the Cartel members' agreement established in the BAR meeting in 2003, providing that the other Carriers would follow those revised Fuel Surcharges. In response, the other Cartel members confirmed their intent to add the maximum limit in the Fuel Surcharge calculation methodology. The BAR meeting was attended by representatives of Korean Airlines, Air France, KLM, and Lufthansa Cargo, among others.[132]

118.     On July 23, 2004, the Singapore BAR CSC held a meeting at Singapore Air's cargo sales conference room.[133] Air France, Cargolux, KLM, and Nippon, among others, attended.[134] One of the "matters arising" was the Fuel Surcharge.[135] The discussion stressed the importance of "cooperation," "transparency," and having in place among the Cartel members "a system of tracking fuel indices that will trigger off a prompt for the carriers to raise

---

[131]     *See DPWN/Air Canada* Compl., at 40 and n.156: E-mail from a Lufthansa Cargo employee to General Manager for Pricing, Lufthansa Cargo (June 21, 2004); Press Release, KLM Cargo, *Fuel surcharge remains 0.20 Euro—KLM Cargo adapts fuel surcharge mechanism* (June 25, 2004).

[132]     KFTC Order, at 36-37.

[133]     *See DPWN/United* Compl., at 37 and n.144: Minutes of the Singapore BAR CSC Meeting (July 23, 2004).

[134]     *See DPWN/United* Compl., at 37 and n.145: Minutes of the Singapore BAR CSC Meeting, at 1 (July 23, 2004).

[135]     *See DPWN/United* Compl., at 37 and n.146: Minutes of the Singapore BAR CSC Meeting, at 3 (July 23, 2004).

the level of fuel surcharge [sic]."[136]   The Chairman instructed the Airfreight Carriers to "exercise some level of co-operation in future exercises, in view of the need for greater transparency with regards to these surcharges."[137]

119.   The Fuel Price Index rose again in late August 2004, and the Airfreight Carriers again discussed whether they should increase the Fuel Surcharge.  KLM suggested to various Airfreight Carriers that they should jointly increase the Fuel Surcharge from USD 0.25 per kilogram to USD 0.30 per kilogram.[138]  After additional private communications between Cartel members, the Airfreight Carriers decided to leave the Fuel Surcharge USD 0.25 per kilogram and delay an increase.[139]

120.   By mid-September 2004, after further communications, the Airfreight Carriers decided to increase the Fuel Surcharge to USD 0.30 per kilogram and did so effective between late September and early October 2004.[140]  Like the increases before it, this Fuel Surcharge increase was staggered to give the misleading impression that the Cartel members' conduct was unilateral.   For example, Air France's  and KLM's respective increases to USD 0.30 per

---

[136]   See *DPWN/United* Compl., at 37 and n.146: Minutes of the Singapore BAR CSC Meeting, at 3 (July 23, 2004).

[137]   See *DPWN/United* Compl., at 37 and n.148: Minutes of the Singapore BAR CSC Meeting, at 7 (July 23, 2004).

[138]   See *DPWN/Air Canada* Compl., at 40 and n.158: E-mail between Qantas Airways employees (Aug. 25, 2004).

[139]   See *DPWN/Air Canada* Compl., at 40 and n.159: E-mail between Lufthansa Cargo employees (Aug. 31, 2004) ("AF [a]nd KL[M] today have not yet reached a decision about what they will do. [They] want to give me an update about the decision tomorrow (Tue). We [Lufthansa Cargo] have signaled, however, that we would follow . . . .We should definitely try to convince AF/KLM to be the first mover. [Lufthansa Cargo] will follow up once again tomorrow [on that]."); E-mail from Senior Manager of Pricing, Lufthansa Cargo, General Manager for Pricing, Lufthansa Cargo (June 21, 2004).

[140]   See *DPWN/Air Canada* Compl., at 41 and n.160:  Press Release, Air Canada, *Air Canada Fuel Surcharge ab 08.10.2004* (Sept. 27, 2004); *see also* Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.30 Effective September 29th* (Sept. 15, 2004); Press Release, Air France Cargo, *Air France Cargo erhoht Fuel Surcharge* (Sept. 21, 2004); Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharge* (Sept. 21, 2004).

kilogram were effective on September 29,[141]   Singapore Air and Swiss WorldCargo on October 4,[142] British Airways on October 7,[143] and Air Canada on October 8.[144]

121.    At the same time that they announced the Fuel Surcharge increase to USD 0.30 per kilogram, the Airfreight Carriers announced two new tiers in preparation for increases in the Fuel Surcharge to USD 0.35 per kilogram and USD 0.40 per kilogram.[145]   The Airfreight Carriers referred to these tiers as the seventh and eighth trigger points.

122.    Pursuant to the seventh trigger point announced in September 2004, in mid-October 2004, the Cartel announced in a coordinated and parallel (although staggered) fashion, another increase in the Fuel Surcharge of USD 0.05 per kilogram to USD 0.35 per kilogram to take effect on or about October 25, 2004.[146]   Like other Fuel Surcharge increases, the increase to USD 0.35 per kilogram was staggered, giving Schenker the impression that the Cartel members were acting unilaterally.   For example, Air Canada's increase was effective on October 25, Martinair's on October 26, and Air France's on October 28.[147]

---

[141]    *See DPWN/United* Compl., at 37 and n.150:  Press Release, *Air France Cargo erhoht Fuel Surcharge* (Sept. 21, 2004); Press Release, *KLM Cargo increases fuel surcharge to Euro 0.30 effective September 29th* (Sept. 15, 2004); E-mail from Walter Burri, Singapore Air, to ACCS members (Sept. 24, 2004); Press Release, *British Airways World Cargo to Increase Fuel Surcharge* (Sept. 24, 2004); Press Release, *Air Canada Fuel Surcharge ab 08.10.2004*(Sept. 27, 2004).

[142]    *See DPWN/Air Canada* Compl., at 41 and n.162: E-mail from Walter Burri, Singapore Air, to ACCS members (Sept. 24, 2004).

[143]    *See DPWN/Air Canada* Compl., at 41 and n.163:  Press Release, *British Airways World Cargo to Increase Fuel Surcharge* (Sept. 24, 2004).

[144]    *See DPWN/United* Compl., at 37 and n. 149:  Press Release, *Air Canada Fuel Surcharge ab 08.10.2004* (Sept. 27, 2004).

[145]    *See DPWN/Air Canada* Compl., at 41 and n.166:  Press Release KLM Cargo, *KLM Cargo Adapts Fuel Surcharge Mechanism and Increases Fuel Surcharge to Euro 0.35* (Oct. 12, 2004); Press Release, British Airways World Cargo, *British Airways World Cargo to Increase Fuel Surcharge* (Sept. 24, 2004).

[146]    *See DPWN/Air Canada* Compl., at 41 and n.167:  Press Release, Air Canada, *Air Canada Fuel Surcharge Ab 25.10.2004* (Oct. 15, 2004); *see also* Press Release, Air France Cargo, *Air France Cargo Increases Fuel Surcharge on Oct 28, 2004* (Oct. 13, 2004); Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharge* (Oct. 13, 2004).

[147]    *See DPWN/United* Compl., at 38 and n.153:  Press Release, Air Canada Cargo, *Air Canada Fuel Surcharge Ab 25.10.2004* (Oct. 15, 2004); Press Release, *Martinair Cargo Increases Fuel Surcharge* (Oct.

123.    Effective in January 2005, the Airfreight Carriers decreased the Fuel Surcharge to USD 0.30 per kilogram.[148]   This decrease was also staggered.   For example, Air France implemented its decrease to USD 0.30 per kilogram on January 1, Lufthansa Cargo on January 3, British Airways on January 6, and Air Canada on January 10.[149]   Air Canada coordinated this decrease among the Cartel members by, among other things, informing the members of ACCS about the intended effective date and amount of its Fuel Surcharge decrease.[150]

124.    Subsequently, however, the Fuel Price Index began to increase again and throughout 2005 the Airfreight Carriers continued to follow the Fuel Price Index mechanism. The Cartel members, including Defendants, raised the Fuel Surcharge in a coordinated and largely parallel (although staggered) fashion.   Thus, for example, effective in March 2005, the Airfreight Carriers increased the Fuel Surcharge back to USD 0.35 per kilogram, again staggering the implementation of this increase to maintain the illusion of unilateral conduct.[151] In connection with this increase, Lufthansa Cargo representative sent an e-mail jointly addressed to representatives of various Cartel members, including SAS, to inform those

---

13, 2004); Press Release, *Air France Cargo erhöht Fuel Surcharge* (Oct. 13, 2004); Press Release, *British Airways World Cargo to Increase Fuel Surcharge* (Oct. 14, 2004).

[148]  *See DPWN/Air Canada* Compl., at 42 and n.171: Press Release, Air Canada, *Air Canada Cargo FSC* (Jan. 4, 2005); E-mail from Rolf Holderegger, Air Canada, to ACCS members (Jan. 3, 2005). *See also* Press Release, Air France Cargo, *Fuel Surcharge decrease from 01/01/2005* (Dec. 17, 2004); Press Release, KLM Cargo, *KLM Cargo decreases fuel surcharge from GBP 0,29 to GBP 0,21 effective January 1, 2005* (Dec. 17, 2004); Press Release, Martinair Cargo, *Martinair Cargo Reduces Fuel Surcharge* (Dec. 20, 2004).

[149]  *See DPWN/United* Compl., at 38 and nn.156-58:  Press Release, Air France, *Fuel surcharge decrease from 01/01/2005* (Dec. 17, 2004); Lufthansa Cargo News, *Lufthansa Cargo lowers fuel surcharge* (Dec. 20, 2004); Press Release, *British Airways World Cargo to Decrease Fuel Surcharge* (Dec. 30, 2004); Press Release, *Air Canada Cargo Fuel Surcharge* (Jan. 4, 2005).

[150]  *See DPWN/Air Canada* Compl., at 42 and n.176: E-mail from Rolf Holderegger, Air Canada, to ACCS members (Jan. 3, 2005).

[151]  *See DPWN/Air Canada* Compl., at 42 and n.177: Chart, Lufthansa Cargo, *Fuel Surcharge Competitor Overview. See also* Press Release, Air France Cargo, *Fuel Surcharge Increase from 22nd March 2005* (Mar. 9, 2005); Press Release, KLM Cargo, *KLM Cargo to increase fuel surcharge March 22* (Mar. 10, 2005); Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel* Surcharge (Mar. 9, 2005).

Airfreight Carriers that Lufthansa Cargo planned to increase its Fuel Surcharge to USD 0.35 per kilogram effective March 21, 2005. In that same e-mail, Lufthansa Cargo also directed the addressees to the Lufthansa Cargo website, where Lufthansa Cargo published its Fuel Price Index.[152]

125.    Effective in early April 2005, the Airfreight Carriers increased the Fuel Surcharge in a coordinated manner to USD 0.40 per kilogram.[153]  Pursuant to the Cartel agreement, the Airfreight Carriers once again staggered the implementation of this increase to hide the existence of the Cartel from Schenker and other customers. For example, Lufthansa Cargo increased its Fuel Surcharge effective on April 4,[154]  Air France and KLM on April 5,[155] and Air Canada and British Airways on April 7.[156]

126.    The Fuel Surcharge increase to USD 0.40 per kilogram was again preceded by an e-mail from a Lufthansa Cargo representative that was jointly addressed to representatives of

---

[152]    *See DPWN/Air Canada* Compl., at 43 and n.179: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Mar. 7, 2005).

[153]    *See DPWN/Air Canada* Compl., at 43 and n.181: Press Release, *Air Canada Cargo Fuel Surcharge Increase* (Mar. 29, 2005); Air Canada, *Surcharges—Canada,* attached to E-mail between Lufthansa Cargo employees (June 20, 2005); *see also* Press Release, *Air France Cargo—Fuel Surcharge Increase from 5 April 2005* (Mar. 24, 2005); Press Release, *KLM Cargo—Fuel Surcharge Increase* (Mar. 24, 2005); Press Release, Martinair Cargo, *Martinair Cargo to increase fuel surcharge April 5th* (Mar. 22, 2005); Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Mar. 22, 2005).

[154]    *See DPWN/Air Canada* Compl., at 43 and n.182: Lufthansa Cargo News, *Record crude oil prices trigger rise in fuel surcharge* (Mar. 21, 2005).

[155]    *See DPWN/United* Compl., at 39 and n.163: Press Release, *Air France Cargo—Fuel Surcharge Increase from 5 April 2005* (Mar. 24, 2005); Press Release, *KLM Cargo—Fuel Surcharge Increase* (Mar. 24, 2005).

[156]    *See DPWN/Air Canada* Compl., at 43 and n.184: Press Release, *Air Canada Cargo Fuel Surcharge Increase* (Mar. 29, 2005); Press Release, *British Airways World Cargo fuel surcharge increase April 7* (Mar. 24, 2005).

various Cartel members, including SAS, informing the addressees that Lufthansa Cargo planned to increase the Fuel Surcharge to USD 0.40 per kilogram effective April 4, 2005.[157]

127.    Effective in July 2005, the Airfreight Carriers increased the Fuel Surcharge to USD 0.45 per kilogram in a coordinated and largely parallel (although staggered) manner.[158] As with other Fuel Surcharge increases, the Airfreight Carriers staggered their implementation dates to disguise their collusive conduct as unilateral decision-making.  For example, Air France and  KLM increased their Fuel Surcharge effective on July 7,[159] Air Canada on July 11,[160] and British Airways on July 14.[161]

128.    The Fuel Surcharge increase to USD 0.45 per kilogram again was preceded by an e-mail from a representative of Lufthansa Cargo that was jointly addressed to representatives of various Cartel members, including SAS, informing the addressees that Lufthansa Cargo planned to increase the Fuel Surcharge to USD 0.45 per kilogram effective July 11, 2005.[162]

---

[157]    *See DPWN/Air Canada* Compl., at 44 and n.185: E-mail from Senior Manager for Pricing, Lufthansa Cargo, to representatives of Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air and South African Airways (Mar. 21, 2005).

[158]    *See DPWN/Air Canada* Compl., at 44 and n.189: Press Release, Air Canada, *Fuel Surcharge Air Canada Cargo* (June 30, 2005); E-mail from Rolf Holderegger, Air Canada, to ACCS members (June 30, 2005). *See also* Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.45 Effective July 7, 2005* (June 23, 2005); Letter from Bruce McCaffrey, Vice President Freight, The Americas, Qantas Freight, to Customer (June 28, 2005).

[159]    *See DPWN/Air Canada* Compl., at 45 and n.190: E-mail from Basil Baramki, Air France, to ACCS members (July 1, 2005).

[160]    *See DPWN/Air Canada* Compl., at 45 and n.191:  Press Release, *Fuel Surcharge Air Canada Cargo* (June 30, 2005).

[161]    *See DPWN/Air Canada* Compl., at 45 and n.192: E-mail from Marek Vrany, British Airways, to ACCS members (June 30, 2005).

[162]    *See DPWN/Air Canada* Compl., at 45 and n.193: E-mail from Senior Manager for Pricing, Lufthansa Cargo, to representatives of Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air and South African Airways (June 27, 2005). *See also* E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air and South African Airways (July 11, 2005).

129.    Effective in September 2005, the Airfreight Carriers increased the Fuel Surcharge to USD 0.50 per kilogram in a coordinated and parallel fashion,[163] but continued to conceal the existence of the Cartel by staggering the implementation of this increase. The increase to USD 0.50 per kilogram was preceded by an e-mail from Lufthansa Cargo's General Manager for Pricing that was jointly addressed to representatives of SAS, among others, informing the addressees that Lufthansa Cargo planned to increase the Fuel Surcharge to USD 0.50 per kilogram effective September 5, 2005.

130.    Shortly after the increase to USD 0.50 per kilogram, the Fuel Price Index exceeded the next threshold, indicating that the Fuel Surcharge should be increased to USD 0.55 per kilogram.[164] However, Lufthansa Cargo sent an e-mail jointly addressed to representatives of various Cartel members, including SAS, stating that Lufthansa Cargo intended to suspend the increase.[165] The other Cartel members likewise suspended the increase until Lufthansa Cargo subsequently decided to increase its Fuel Surcharge.

131.    On October 5, 2005, Lufthansa Cargo informed other Airfreight Carriers that it was prepared to lift the suspension and increase the Fuel Surcharge to USD 0.55 per kilogram effective October 17, 2005.[166] Lufthansa Cargo communicated this decision in an e-mail jointly

---

[163]   *See DPWN/Air Canada* Compl., at 45 and n.197: E-mail from Rolf Holderegger, Air Canada, to ACCS members (Aug. 24, 2005). *See also* Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.50 Effective September 5, 2005* (Aug. 22, 2005); Letter from Air France Cargo to Customer (Aug. 23, 2005); Press Release, Air France Cargo, *Modification Fuel Surcharge AF* (Sept. 16, 2005); Letter from Bruce McCaffrey, Vice President Freight, The Americas, Qantas Freight, to Customer (Aug. 22, 2005).

[164]   *See DPWN/Air Canada* Compl., at 46 and n.203: E-mail from Lufthansa Cargo to Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Sept. 12, 2005).

[165]   *See DPWN/Air Canada* Compl., at 46 and n.203: E-mail from Lufthansa Cargo to Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Sept. 12, 2005).

[166]   *See DPWN/Air Canada* Compl., at 47 and n.205: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Oct. 5, 2005).

addressed to representatives of various Cartel members, including SAS.[167]   The other Cartel members then implemented the increase to USD 0.55 per kilogram on a coordinated, but staggered, basis.[168]

132.   On October 19, 2005, Lufthansa Cargo and Air France representatives met in Paris.   There, the parties assured each other that "they wish to consistently apply the fuel surcharge mechanism."   They further agreed that "unilateral measures" with respect to the Fuel Surcharge ought not to be taken.[169]

133.   On October 21, 2005, Korean Air sent an updated and revised version of Korean Air's Fuel Price Index methodology and the corresponding Fuel Surcharge amounts for flights departing from Korea in an e-mail jointly addressed to representatives of Air Canada, Air France, and Lufthansa Cargo, among other Airfreight Carriers.[170]

134.   Effective in late October and early November 2005, the Airfreight Carriers increased the Fuel Surcharge to USD 0.60 per kilogram in a coordinated and parallel (although staggered) fashion.[171]   The increase to USD 0.60 per kilogram was again preceded by an e-mail from Lufthansa Cargo that was jointly addressed to representatives of various Cartel members,

---

[167]   *See DPWN/Air Canada* Compl., at 47 and n.205: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Oct. 5, 2005).

[168]   *See DPWN/Air Canada* Compl., at 47 and n.207: E-mail from Rolf Holderegger, Air Canada to ACCS Members (Oct. 7, 2005). *See also* Press Release, KLM Cargo, *KLM Cargo Increases Fuel Surcharge to Euro 0.55 Effective October 17, 2005* (Oct. 5, 2005); Press Release, Air France Cargo, *Air France Increases Fuel Surcharges* (Oct. 6, 2005).

[169]   Competition Commission Compl., at 24.

[170]   *See DPWN/Air Canada* Compl., at 48 and n.211: E-mail from Chris Yang, Manager, Cargo Route & Fleet Management (Oct. 21, 2005).

[171]   *See DPWN/Air Canada* Compl., at 48 and n.214: Press Release, Air Canada, *New Air Canada Fuel Surcharge* (Oct. 19, 2005).   *See also* Press Release, Air France-KLM, *Air France Cargo-KLM Cargo increase fuel surcharge to Euro 0.60 effective October 28th, 2005* (Oct. 17, 2005); Press Release, Martinair Cargo, *Martinair Cargo Increases Fuel Surcharges* (Oct. 19, 2005); Letter from Bruce McCaffrey, Vice President Freight, The Americas, Qantas Freight, to Customer (Oct. 21, 2005); Lufthansa Cargo News, *Lufthansa Cargo raises fuel surcharge to 0.60 Euro/kg* (Oct. 13, 2005); Press Release, *British Airways World Cargo to increase Fuel Surcharge* (Oct. 21, 2005).

including SAS, informing the addressees that Lufthansa Cargo planned to increase the Fuel Surcharge to USD 0.60 per kilogram effective October 24, 2005.[172]

135.    In late November 2005, as the Fuel Price Index began to decline, the Airfreight Carriers in accordance with the Cartel agreement and in a coordinated and parallel fashion, reduced the Fuel Surcharge by USD 0.05 per kilogram to USD 0.55 per kilogram.[173]   Once again, the Cartel members staggered their implementation dates.  For example, Air France-KLM implemented the decrease effective on November 16,[174] Martinair on November 18,[175] Air Canada on November 21,[176] and British Airways on November 24.[177]

136.    The decrease to USD 0.55 per kilogram was preceded by an e-mail from Lufthansa Cargo that was jointly addressed to representatives of various Cartel members, including SAS, informing the addressees that Lufthansa Cargo planned to decrease the Fuel Surcharge to USD 0.55 per kilogram effective November 21, 2005.[178]   In accordance with the Cartel agreement and in a coordinated manner, the Cartel members decreased the Fuel

---

[172]    *See DPWN/Air Canada* Compl., at 48 and n.215: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Oct. 14, 2005).

[173]    *See DPWN/Air Canada* Compl., at 49 and n.219: Press Release, Air Canada, *Air Canada Cargo Fuel Decrease* (Nov. 11, 2005); E-mail from Rolf Holderegger, Air Canada, to ACCS Members (Nov. 11, 2005); *see also* Press Release, Air France-KLM, *Air France Cargo—KLM Cargo Decreases Fuel Surcharge to Euro 0.55 Effective November 16, 2005* (Nov. 2, 2005); Press Release, Martinair, *Martinair Cargo Reduces Fuel Surcharge* (Nov. 8, 2005); IATA Information Service, *Fuel Surcharge by Carrier* (Nov. 1-11, 2005).

[174]    *See DPWN/United* Compl., at 41 and n.178:  Press Release, *AF: Fuel Surcharge Decrease 16NOV05* (Nov. 3, 2005).

[175]    *See DPWN/United* Compl., at 41 and n.178:  Press Release, *AF: Fuel Surcharge Decrease 16NOV05* (Nov. 3, 2005).

[176]    *See DPWN/Air Canada* Compl., at 49 and n.223:  Press Release, *Air Canada Cargo FSC decrease* (Nov. 11, 2005).

[177]    *See DPWN/Air Canada* Compl., at 49 and n.224:  Press Release, *British Airways World Cargo to decrease Fuel Surcharge* (Nov. 10, 2005).

[178]    *See DPWN/Air Canada* Compl., at 50 and n.225: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Nov. 8, 2005).

Surcharge to USD 0.50 per kilogram in late November and early December 2005.[179] Again pursuant to the Cartel agreement, the Airfreight Carriers staggered the implementation of this decrease to prevent Schenker and other Airfreight Customers from detecting the Cartel. For example, Air France-KLM decreased their Fuel Surcharges effective November 28,[180] and Air Canada on December 1, 2005.[181]

137. As the Fuel Price Index continued to decrease, the Airfreight Carriers decreased the Fuel Surcharge to USD 0.45 per kilogram in early December 2005.[182] This decrease was also staggered to give the false impression of unilateral action. For example, Air France-KLM implemented an additional decrease effective on December 1, Lufthansa Cargo on December 5, Martinair on December 6, Air Canada on December 8, and Emirates on December 9, 2005.[183]

---

[179]   *See DPWN/Air Canada* Compl., at 51 and n.231: Press Release, Air Canada, *Air Canada Cargo FSC Decrease* (Nov. 21, 2005); E-mail from Rolf Holderegger, Air Canada, to ACCS Members (Nov. 22, 2005). *See also* Press Release, Air France-KLM, *Air France Cargo—KLM Cargo reduces fuel surcharge to Euro 0.50 effective November 28, 2005* (Nov. 15, 2005); Press Release, Martinair Cargo, *Martinair Cargo Reduces Fuel Surcharge* (Nov. 16, 2005); Press Release, American Airlines Cargo, *American Airlines Cargo Decrease Fuelsurcharge* (Nov. 18, 2005); Press Release, Lufthansa Cargo, *Lufthansa Cargo Lowers Fuel Surcharge to 0.45 Euro/kg* (Nov. 22, 2005).

[180]   *See DPWN/United* Compl., at 41 and n.181: Press Release, *Air France Cargo–KLM Cargo reduces fuel surcharge to Euro 0.50 effective November 28, 2005* (Nov. 15, 2005); Press Release, *Air Canada Cargo FSC Decrease* (Nov. 21, 2005); Press Release, *Air France Cargo – KLM Cargo reduces fuel surcharge 01 December* (Nov. 22, 2005); Lufthansa Cargo News, *Lufthansa Cargo lowers fuel storage surcharge to 0.45 Euro/kg* (Nov. 21, 2005); Press Release, *Martinair Cargo to Reduce Fuel Surcharge* (Nov. 23, 2005); Press Release, *Air Canada Cargo FSC Reduction* (Dec. 1, 2005); Press Release, *Emirates SkyCargo Fuel surcharge decrease 09 December* (Dec. 2, 2005).

[181]   *See DPWN/United* Compl., at 41 and n.181: Press Release, *Air France Cargo–KLM Cargo reduces fuel surcharge to Euro 0.50 effective November 28, 2005* (Nov. 15, 2005); Press Release, *Air Canada Cargo FSC Decrease* (Nov. 21, 2005); Press Release, *Air France Cargo – KLM Cargo reduces fuel surcharge 01 December* (Nov. 22, 2005); Lufthansa Cargo News, *Lufthansa Cargo lowers fuel storage surcharge to 0.45 Euro/kg* (Nov. 21, 2005); Press Release, *Martinair Cargo to Reduce Fuel Surcharge* (Nov. 23, 2005); Press Release, *Air Canada Cargo FSC Reduction* (Dec. 1, 2005); Press Release, *Emirates SkyCargo Fuel surcharge decrease 09 December* (Dec. 2, 2005).

[182]   *See DPWN/Air Canada* Compl., at 51 and n.231: Press Release, Air Canada, *Air Canada Cargo FSC Reduction* (Dec. 1, 2005); *see also* Customer News Letter, Air France-KLM, *Air France Cargo—KLM Cargo reduces fuel surcharge to Euro 0.45 effective December 1, 2005* (Nov. 22, 2005); Letter from Martinair Cargo to Customers (Nov. 23, 2005); Press Release, American Airlines Cargo, *American Airlines Cargo Decrease Fuelsurcharge* (Dec. 2, 2005).

[183]   *See DPWN/Air Canada* Compl., at 51 and n.231: Press Release, Air Canada, *Air Canada Cargo FSC Reduction* (Dec. 1, 2005); *see also* Customer News Letter, Air France-KLM, *Air France Cargo—KLM Cargo reduces fuel surcharge to Euro 0.45 effective December 1, 2005* (Nov. 22, 2005); Letter from

138.    The decreases to both USD 0.50 per kilogram and USD 0.45 per kilogram, like the previous changes in the Fuel Surcharge, were preceded by e-mails from Lufthansa Cargo that were jointly addressed to representatives of various Cartel members, including SAS, informing the addressees of the date and amount of Lufthansa Cargo's planned Fuel Surcharge decrease.[184]

139.    In January 2006, the Fuel Price Index exceeded the relevant threshold, indicating that the Fuel Surcharge should be increased.[185]   Thus, on January 25, 2006, a representative of Martinair sent an e-mail to representatives of Air France, Cargolux, Lufthansa Cargo, and SAS, among others, inviting them to a February 2, 2006, meeting at Martinair Cargo's Asia Pacific Continental Headoffice.[186]   The explicit topic of discussion was the Fuel Surcharge.[187]   Upon information and belief, each of the Airfreight Carriers attending the meeting agreed to raise the Fuel Surcharge and each attendee increased the Fuel Surcharge shortly after the meeting,[188] as did Lufthansa's Alliance partners, including SAS.  Also on February 2, 2006, Singapore Air,

---

Martinair Cargo to Customers (Nov. 23, 2005); Press Release, American Airlines Cargo, *American Airlines Cargo Decrease Fuelsurcharge* (Dec. 2, 2005).

[184]    *See DPWN/Air Canada* Compl., at 51 and n.237: E-mail from General Manager for Pricing, Lufthansa Cargo, to representatives of Air Canada, Air China, Air New Zealand, Cathay Pacific, EVA Airways, Japan Airlines, Korean Air, LAN Cargo, SAS, Singapore Air, and South African Airways (Nov. 15, 2005).

[185]    *See DPWN/Air Canada* Compl., at 52 and n.241: E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo, and Swiss WorldCargo (Feb. 2, 2006).

[186]    *See DPWN/Untied* Compl., at 42 and n.183:  E-mail from Winnie Hui, Management Assistant, Asia Pacific, Martinair Cargo, to representatives of Air France, British Airways, Cargolux, Lufthansa Cargo, SAS, and Virgin, among others (Jan. 25, 2006).

[187]    *See DPWN/United* Compl., at 42 and n.183:  E-mail from Winnie Hui, Management Assistant, Asia Pacific, Martinair Cargo, to representatives of Air France, British Airways, Cargolux, Lufthansa Cargo, SAS, and Virgin, among others (Jan. 25, 2006).

[188]    *See DPWN/United* Compl., at 42 and n.185: Letter from Martinair Cargo to Customers (Feb. 2, 2006); E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air and Swiss WorldCargo (Feb. 3, 2006); E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo, and Swiss WorldCargo (Feb. 2, 2006); Press Release, Air France-KLM, *Air France Cargo - KLM Cargo increases fuel surcharge to Euro 0.50 effective February 14, 2006* (Feb. 1, 2006); Press Release, Lufthansa Cargo, *Lufthansa Cargo raises fuel surcharge to 0.50 Euro/kg* (Feb. 6, 2006).

which had not attended the February 2 meeting, e-mailed Lufthansa Cargo and KLM, among others, stating its understanding that the Airfreight Carriers would be increasing Fuel Surcharges.[189] KLM responded that it would also be increasing its Fuel Surcharge.[190]

140. Thus, the Cartel members decided to increase their Fuel Surcharges in a coordinated and parallel fashion to USD 0.50 per kilogram effective in mid-February 2006.[191] Once again, the Airfreight Carriers staggered their implementation of this increase to give the fraudulent appearance of unilateral conduct. For example, Air France-KLM increased their Fuel Surcharges to USD 0.50 per kilogram effective on February 14, Martinair on February 15, British Airways on February 16, and Qantas on February 20, 2006.[192]

141. Moreover, the alignment of the Fuel Surcharges imposed by Defendants lasted well beyond February 2006. Various Cartel members, including Air France and KLM which later pleaded guilty to fixing Fuel Surcharges through "*at least* February 14, 2006,"[193] acting in accordance with the illegal Cartel agreement, raised the Fuel Surcharge to 0.55 per kilogram.[194]

---

[189] *See DPWN/United* Compl. at 42 and n.186: E-mail from Walter Burri, Singapore Air, to representatives of British Airways, KLM, Lufthansa Cargo, and Swiss WorldCargo (Feb. 2, 2006).

[190] *See DPWN/United* Compl. at 42 and n.187: E-mail from Susanne Erb, KLM Cargo, to representatives of British Airways, Lufthansa Cargo, Singapore Air, and Swiss WorldCargo (Feb. 3, 2006).

[191] *See DPWN/Air Canada* Compl., at 52 and n.242: Press Release, Air Canada, *Air Canada Cargo Fuel Increase* (Feb. 10, 2006); *see also* E-mail between Lufthansa Cargo employees (Feb. 3, 2006); Press Release, Air France-KM *Air France Cargo—KLM Cargo increases fuel surcharge to Euro 0.50 effective February 14, 2006* (Feb. 1, 2006); Letter from Martinair Cargo to Customers (Feb. 2, 2006).

[192] *See DPWN/United* Compl. at 43 and n.195: Press Release, *AF-KL Fuel Surcharge Increase 14FEB06* (Feb. 1, 2006); Press Release, *Martinair Cargo Increases Fuel Surcharge* (Feb. 2, 2006); Press Release, *British Airways World Cargo to Increase Fuel Surcharge* (Feb. 2, 2006); Press Release, *Air Canada Cargo Fuel Increase* (Feb. 10, 2006); *see also DPWN/United* Compl., at 42 and n.193: Letter from Bruce McCaffrey, Qantas Airlines, to Customers (Feb. 6, 2006).

[193] *See* http://www.justice.gov/atr/cases/f234400/234437.htm (emphasis added).

[194] *See DPWN/United* Compl., at 46 and n.197: Press Release, Air France-KLM, *Air France Cargo — KLM Cargo increases fuel surcharge to Euro 0.55 effective May 03, 2006* (Apr. 20, 2006); Letter from TAP-Portugal Cargo to Customers (Apr. 20, 2006); Press Release, Cargolux, *Cargolux Adapts Its Fuel Surcharge* (Apr. 21, 2006); Press Release, Lufthansa Cargo, *Lufthansa Cargo raises fuel surcharge to 0.55 Euro/kg* (Apr. 24, 2006); Letter from Bruce McCaffrey, Qantas Airways, to Customers (Apr. 25, 2006); Letter from Korean Air Cargo to Customers (Apr. 25, 2006); Letter from Martinair Cargo to

They implemented that increase on staggered dates, continuing to give the impression that they were acting unilaterally.[195]

142.    On or about May 1, 2006, a United employee met with Qantas' Vice President of Freight for the Americas in Las Vegas and discussed rates.[196]  The two individuals had met on a number of prior occasions, including the following: April 5, 2005 at Café Pinguini; July 22, 2005 at Capistrano's Restaurant; and November 14, 2005, at Los Angeles Airport. Separately, another United executive met with the same Qantas executive on October 22, 2004.[197]  Qantas' plea agreement implicitly acknowledged that the conspiracy did not end in February 2006, admitting that it conspired "until *at least* February 14, 2006."[198]

143.    Between May 3 and 11, 2006, just a few days after United's meeting with Qantas, Qantas announced still another increase in its Surcharges, putting the Fuel Surcharge at USD 0.60 per kilogram effective on or about May 17, 2006.[199]  United also increased its Fuel Surcharge, as did Air France, Cargolux, KLM, and Lufthansa Cargo.  These increases were not necessary to cover increased costs of aviation fuel, as the increase in the Fuel Surcharge was

---

Customers (Apr. 26, 2006); Letter from American Airlines Cargo to Customers (Apr. 26, 2006); Letter from Air Canada to Customers (Apr. 28, 2006).

[195]  *See DPWN/United* Compl., at 47 and n.198:  Press Release, *Air Canada Cargo increases FSC eff 16. May 06* (Apr. 28, 2006); *see also* Press Release, Air France-KLM, *AF-KL Fuel Surcharge Increase 03MAY06* (Apr. 20, 2006); Letter from Martinair Cargo to Customers (Apr. 26, 2006).

[196]  *See DPWN/United* Compl., at 48 and n.200:  Expense Report for Bruce McCaffrey, Qantas Airways, at 5 (May 2006).

[197]  *See* Press Release, U.S. Dep't of Justice, *Former Qantas Airline Executive Agrees to Plead Guilty to Participating in Price-Fixing Conspiracy on Air Cargo Shipments* (May 8, 2008).

[198]  *See United States v. Qantas Airways Limited*, Criminal No. 07-322, Plea Agreement, at 3 (D.D.C. Jan. 14, 2008) (emphasis added).

[199]  *See DPWN/United* Compl., at 47 and n.203:  Letter from Bruce McCaffrey, Qantas Airways, to Customers (May 5, 2006).

disproportionate to any actual increase in the price of aviation fuel, and the Airfreight Carriers continued to be careful to stagger the implementation dates of their Fuel Surcharge increases.[200]

144.   The Cartel members' Fuel Surcharge remained at USD 0.60 per kilogram until approximately mid-October 2006, when they reduced the Fuel Surcharge to USD 0.55 per kilogram.[201]   Despite this decrease, the Fuel Surcharge still exceeded, and was unnecessary to recover, the actual fuel-related costs of Defendants and the other Airfreight Carriers.   In addition, on information and belief, Defendants continued to impose Fuel Surcharges that exceeded, and were unnecessary to recover, its actual fuel-related costs throughout the Relevant Period.   Schenker was subject to and paid these inflated Fuel Surcharges for U.S. Airfreight Shipping Services it purchased from Defendants and the other Cartel members throughout the Relevant Period.

## The Cartel's Conspiratorial Security Surcharge Activities

145.   In addition to increasing prices relating to the Fuel Surcharge on Airfreight Shipping Services, including U.S. Airfreight Shipping Services, through Fuel Surcharges, Defendants and the other members of the Cartel agreed to and did jointly and collusively agree to increase prices paid by Schenker during the Relevant Period through an illegally price-fixed Security Surcharge.[202]

---

[200]   *See DPWN/United* Compl., at 47 and n.199:  Press Release, *Air Canada Cargo Fuel Increase* (May 17, 2006); *see also* Lufthansa Cargo News, *Lufthansa Cargo raises fuel surcharge to 0.60 Euro/kg* (May 2, 2006); Press Release, *AF-KL Fuel Surcharge Increase 17MAY06* (May 3, 2006); Press Release, *British Airways World Cargo - Fuel Surcharge Newsflash* (May 8, 2006).

[201]   *See DPWN/United* Compl., at 48 and n.204:  Press Release, Air France-KLM, *Air France Cargo-KLM Cargo decreases fuel surcharge to Euro 0.55 effective October 9, 2006* (Sept. 25, 2006); Letter from Martinair Cargo to Customers (Sept. 27, 2006).

[202]   *See* Competition Commission Compl., at 25 ("The basis of the over-arching agreement, arrangements, or understandings [regarding Fuel Surcharges] was that the respondents would fix their fuel surcharge rates by reference to the IATA agreement, or would at any rate not act independently in setting fuel surcharge rates.  In order words, all the above agreements were not discrete agreements with different adherents but were part and parcel of the execution of a continuing international agreement with the same participants,

146.    Following the September 11, 2011 terrorist attacks, Defendants and other Cartel members met, communicated, and jointly agreed to impose a new Surcharge, the Security Surcharge, upon their Airfreight Customers, which remained in effect thereafter.   Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including the United States.

147.    Defendants acted jointly in order to facilitate agreements regarding exceptions, discounting, and caps relating to the Security Surcharge and, with few exceptions among the Cartel members, jointly implemented the agreed-upon Security Surcharge worldwide.

148.    The Security Surcharge imposed by the Cartel members, including Defendants, bore little or no relationship to external costs and was not calculated based on actual security-related costs, as evidenced by the fact that the Cartel members initially referred to the Surcharge by different names, including the "insurance surcharge."[203]

149.    The members of the Cartel, including Defendants, used the Fuel Surcharge as a model for the Security Surcharge, so that the Security Surcharge could be easily implemented and monitored without having to make any complex calculations.   Like the Fuel Surcharge, the dollar amount of the Security Surcharge was not based on any measure of actual costs, but merely on weight.   As one Lufthansa Cargo executive noted:

> The calculation on the basis of AW [actual weight] has already been applied in the calculation of the fuel surcharge and is therefore easier to communicate internally and externally.   This has been particularly important in the current situation since a fast and

---

the same procedures and the same common object, namely to establish a generally applicable mechanism for fixing prices, which mechanism (if adapted) would nevertheless yield reasonably uniform results.").

[203]    *See DPWN/United* Compl., at 48-49 nn.205-08: E-mail between Lufthansa Cargo employees (Oct. 1, 2001); E-mail between Lufthansa Cargo employees (Sept. 26, 2001); E-mail from Frank P. deReij, Senior Vice President, KLM Cargo, to Lufthansa Cargo employee (Oct. 2, 2001); E-mail between Lufthansa Cargo employees (Oct. 5, 2001); Lufthansa Cargo, *Europe Airlines Security & Fuel Surcharges* (Nov. 15, 2001).

successful implementation was important.  In addition, the billing procedure is already known from the fuel surcharge and implemented.[204]

150.    One of the first known meetings to discuss the Security Surcharge occurred on September 26, 2001.  At the meeting,  representatives from thirty-three (33) Airfreight Carriers, including Lufthansa Cargo and Qantas, among others, met in Hong Kong and discussed the Security Surcharge.[205]   Although the e-mail summary does not list all of the thirty-three (33) Airfreight Carriers that attended this meeting,[206] On information and belief, Defendants operated in Hong Kong and attended the meeting.  At the meeting, Defendants' and their co-conspirators' representatives discussed the amount of the Security Surcharge.  Cathay Pacific proposed a Security Surcharge of USD 0.05 per kilogram.  The majority of Airfreight Carriers "indicated between 0.10 and 0.15 USD per kg." was appropriate, and this was agreed to.[207]

151.    A number of Airfreight Carriers also met in Johannesburg on October 2, 2001, at the airport offices of South African Airways to discuss the Security Surcharge and the market's "very negative response" to it.[208]  Despite the negative response, the Airfreight Carriers decided, "[i]n agreement with almost all airlines except Egypt Air," to impose a worldwide Security Surcharge of EUR 0.15 per kilogram on their customers effective October 8 or 15, 2001.[209] They also agreed that Lufthansa Cargo would be the first Airfreight Carrier to inform the

---

[204]    *See DPWN/Air Canada* Compl., at 52 and n.243: E-mail between Lufthansa Cargo employees (Oct. 1, 2001).

[205]    *See DPWN/Air Canada* Compl., at 53 and n.249: E-mail between Lufthansa Cargo employees (Sept. 28, 2001).

[206]    *See DPWN/Air Canada* Compl., at 53 and n.249: E-mail between Lufthansa Cargo employees (Sept. 28, 2001).

[207]    *See DPWN/Air Canada* Compl., at 53 and n.249: E-mail between Lufthansa Cargo employees (Sept. 28, 2001).

[208]    *See DPWN/United* Compl., at 50 and n.214:  E-mail between Lufthansa Cargo employees (Oct. 1, 2001); E-mail between Lufthansa Cargo employees (Sept. 29, 2001).

[209]    *See DPWN/United* Compl., at 50 and n.216:  E-mail between Lufthansa Cargo employees (Oct. 3, 2001).

market of the Security Surcharge, "followed closely by KLM and AF [Air France]."[210] For easy implementation and monitoring, the Security Surcharge did not vary by the distance shipped. The Cartel members recognized that they "still need[ed] to do a lot of communication" to keep the Cartel functioning,[211] and accordingly, a number of them met again in Nairobi, Kenya, on October 4, 2001.[212]

152.    Prior to implementation of the Security Surcharge, Lufthansa Cargo, which was already coordinating with its Alliance members, coordinated with at least sixteen (16) other Airfreight Carriers, including Air France and KLM, at the CEO level.[213]

153.    The Airfreight Carriers subsequently implemented the Security Surcharge, effective on various dates in October 2001, which Surcharge applied to shipments worldwide, including to and from the United States.[214] As with the Fuel Surcharge, the Airfreight Carriers staggered the implementation of the Security Surcharge, giving Schenker and other Airfreight Customers the false impression that the Cartel members were acting unilaterally. For example, Air France's Security Surcharge went into effect on October 8, 2001[215] KLM's on October 15, 2001[216] and Asiana Airlines' on October 16, 2001.[217] Thus, at the time, Schenker believed that

---

[210]    *See DPWN/United* Compl., at 50 and n.216:  E-mail between Lufthansa Cargo employees (Oct. 3, 2001).

[211]    *See DPWN/United* Compl., at 50 and n.217:  E-mail between Lufthansa Cargo employees (Oct. 4, 2001).

[212]    *See DPWN/United* Compl., at 50 and n.217:  E-mail between Lufthansa Cargo employees (Oct. 4, 2001).

[213]    *See DPWN/United* Compl., at 51 and n.219:  E-mail between Lufthansa Cargo employees (Oct. 12, 2001); E-mail between Lufthansa Cargo employees (Oct. 24, 2001).

[214]    *See DPWN/United* Compl., at 51 and n.222: Chart, Lufthansa Cargo, *War Risk/Security Surcharge Update* (Oct. 12, 2001); *see also* KLM Cargo, *Security Surcharge on KLM Cargo Shipments Effective October 15, 2001* (Oct. 1, 2001); E-mail between Lufthansa Cargo employees (Oct. 4, 2001).

[215]    *See DPWN/United* Compl., at 51 and n.223:  E-mail between Lufthansa Cargo employees (Oct. 4, 2001).

[216]    *See DPWN/United* Compl., at 51 and n.224:   Chart, Lufthansa Cargo, *War Risk/Security Surcharge Update* (Oct. 12, 2001); Newsletter, *Security Surcharge on KLM Cargo Shipments Effective October 15, 2001* (Oct. 1, 2001).

[217]    *See DPWN/United* Compl., at 51 and n.225:   Chart, Lufthansa Cargo, War Risk/Security Surcharge Update (Oct. 12, 2001).

Defendants were acting unilaterally, following the lead of other Airfreight Carriers, all of which appeared to be reacting to a common event — the terrorist attacks of September 11, 2001, and the resulting increase in security costs.

154. After the Security Surcharge went into effect, Lufthansa Cargo continued to act as one of the primary facilitators of the conspiracy, coordinating with the other Airfreight Carriers.[218]

155. Subsequently, at a January 23, 2003, meeting of the Singapore BAR CSC, Air France, Cathay Pacific, and the other Airfreight Carriers in attendance "agreed that there would be no reduction to the [Security] charge."[219]

156. The Airfreight Carriers, including Defendants, continued to charge, and Schenker continued to pay, the illegally price-fixed Security Surcharge relating to U.S. Airfreight Shipping Services provided by the Airfreight Carriers and described herein throughout the Relevant Period. Upon information and belief, the Security Surcharges that Schenker paid and that Defendants and the other members of the Cartel imposed exceeded their actual security-related costs. For example, as of December 5, 2005, the prevailing Security Surcharge was set at a uniform USD 0.15, regardless of differences in actual security costs.[220]

## The Cartel's Concerted Refusal to Discount

157. Airfreight Carriers historically and typically allow Airfreight Customers, such as Schenker, a yearly revenue–based rebate or discount, also known as "incentive agreements," on Airfreight Shipping Services secured by the Airfreight Customer. These agreements generally

---

[218]  *See DPWN/Untied* Compl., at 51 and n.226: E-mail between Lufthansa Cargo employees (Jan. 26, 2004); E-mail between Lufthansa Cargo employees (Sept. 13, 2004).

[219]  *See DPWN/United* Compl., at 52 and n.228: Minutes, Singapore Bar Sub-Committee Meeting (Jan. 23, 2003).

[220]  *In re Air Cargo Shipping Services Antitrust Litigation*, First Consol. Am. Compl., at 20, MDL No. 1775 (E.D.N.Y.) (filed Feb. 8, 2007).

have global validity.  Pursuant to such incentive agreements, the parties agree that, if the Airfreight Customer, through its regional companies, achieves a certain previously defined fixed net purchasing volume or "target" with the Airfreight Carrier or its regional companies during the relevant calendar year, the Airfreight Carrier will grant the Airfreight Customer, such as Schenker, a rebate, also called a "special payment" or "incentive."  The airfreight volume that the contractual parties define as the target is based on the purchasing volume of the previous calendar year. The special payment or incentive that is granted is calculated on the basis of the net freight rate (freight price, excluding surcharges) or the total tonnage.

158.    Schenker concluded incentive agreements with Air France, KLM, and Cargolux in each year of the Relevant Period.  Schenker concluded incentive agreements with Qantas during the years 2004 to 2007, and with SAS during the years 2004 and 2008.

159.    However, during the Relevant Period, these Defendants secretly met, communicated, and jointly conspired with the other Cartel members to increase the prices of U.S. Airfreight Shipping Services by concertedly agreeing to exclude Fuel and Security Surcharge revenues from any incentive, revenue-based rebate, or discount program entered into with their Airfreight Customers, including Schenker.[221]

160.    For example, at a July 28, 2005, meeting of the Cargo Sub-Committee for the Board of Airline Representatives in Singapore, attended by Cargolux among other Airfreight Carriers, the attendees agreed that they would not grant the Airfreight Customers incentive or revenue-based discounts on Surcharges.[222]

161.    As a result of these secret meetings and communications, these Defendants and the Cartel collusively agreed to refuse to provide contractually agreed upon incentives, rebates

---

[221]    *See generally* KFTC Order, at 20-23; *Benchmark* Compl., at 37-38.

[222]    *See Benchmark* Compl., at 37-38.

or discounts to Airfreight Customers, including Schenker, with respect to the Fuel and Security Surcharges on U.S. Airfreight Shipping Services, with the specific purpose of eliminating competition among the Airfreight Carriers.[223]   In contrast, before the Cartel agreements were collusively entered into by Defendants and their co-conspirators, the granting of incentives, discounts, or rebates based on the total price of the U.S. Airfreight Shipping Services, including any surcharges, by the Airfreight Carriers was standard industry practice.[224]

## DEFENDANTS' INTENT AND CONSPIRATORIAL COMMUNICATIONS

162.   Defendants' wrongful acts complained of herein were done knowingly, intentionally, purposefully, and wilfully, and were carried out with knowledge and the wilful disregard of the rights of Schenker in a calculating fashion and/or with the expectation of profiting therefrom to Schenker's substantial injury.

163.   Throughout the Cartel Period, Defendants and the other members of the Cartel routinely and intentionally engaged in private communications about Surcharges, and discounts and incentive agreements, many of which subsequently pled guilty to criminal price-fixing and paid criminal fines to the DOJ.   These private communications were meant to serve and did serve to monitor the Cartel and to implement changes pursuant to the Cartel agreements.

164.   For example, prior to and throughout the Relevant Period, Defendants and the other members of the Cartel participated in various trade associations through which they had the opportunity to, and did, collude with regard to the pricing of Airfreight Shipping Services, including U.S. Airfreight Shipping Services.   The trade associations in which Defendants participated included, for example, IATA, an airline industry body which regularly convenes airline forums for its members on industry issues.   Other such associations include, for example,

---

[223]      *See generally* KFTC Order, at 20-23; *Benchmark* Compl., at 37-38.

[224]      *See generally* KFTC Order, at 20-23; *Benchmark* Compl., at 37-38.

the Airline Cargo Business Association of Thailand, the Airline Cargo Council of Switzerland, the Airline Cargo Agents Association of India, the Board of Representatives of India, the Korean Board of Airline Representatives, the Singapore Board of Airline Representatives, and GCCI. The Airfreight Carriers, including Defendants, used such trade association meetings and activities to monitor the Cartel and its collusive activities.

165.   In addition to trade associations, Airfreight Carriers frequently participate in marketing organizations described as "alliances." For example, SAS was a member of the Star Alliance. Star Alliance members, which also included United and Lufthansa Cargo, frequently engaged in communications with other Star Alliance members and with non-Star Alliance Airfreight Carriers to covertly fix Fuel and Security Surcharges and conspire with regard to discount or rebate agreements for U.S. Airfreight Shipping Services during the Relevant Period in furtherance of the Cartel. Various members of the Star Alliance, including SAS, have acknowledged participation in the Cartel and admitted liability. Upon information and belief, Lufthansa Cargo used the Alliance to ensure that the other Cartel members also adhered to this agreement not to allow exceptions or adjustments to the price-fixed Surcharges. In addition, Lufthansa and SAS, both members of the Cartel, were members of the WOW Cargo Alliance during the Relevant Period.

166.   Agreements reached at these trade association meetings and in connection with Airfreight Carriers' alliances were not and are not immune from the antitrust laws of the United States. Agreements reached at IATA meetings, for example, are only immune from the antitrust laws of the United States if the U.S. DOT expressly approves those agreements, which the U.S. DOT did not do with respect to any of the Cartel agreements that are the subject of this

Complaint. Absent an express grant of antitrust immunity by the U.S. DOT, the antitrust laws of the United States apply to all such associations and alliances.

167. In addition, a series of secret meetings between the Cartel members, known as "coffee rounds," took place throughout the Relevant Period. Defendants Air France and KLM and co-conspirator Lufthansa Cargo, among others, routinely attended such meetings.[225] For example, on May 22, 2000, the core group of Cartel members, including Air France, British Airways, KLM, Lufthansa Cargo, and Swissair, held a "coffee round" at Lufthansa Cargo's meeting room in Toronto.[226] Upon information and belief, the purpose of the "coffee round" meetings was to exchange competitively sensitive information to monitor the Cartel and prevent "cheating" on the Cartel.[227] Upon information and belief, Lufthansa Cargo coordinated Star Alliance and Cartel pricing activity with that of the other participants in the "coffee rounds."[228]

168. The Cartel members, including Defendants, engaged in other, frequent private communications to make sure the Cartel was functioning properly. These private communications included in-person meetings, e-mails, faxes, and other communications during the Relevant Period, in which the Cartel members, including Defendants, discussed competitively sensitive information, including capacity, Base Rates, and Surcharges.

---

[225] *See DPWN/Air Canada* Compl., at 65 and n.316: Lufthansa Cargo, Meeting Summary, at 3 (May 24, 2002) (indicating that Lufthansa Cargo planned to "reanimate" the coffee rounds with "OALs" (other airlines)).

[226] *See DPWN/United* Compl., at 71 and n.335: E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000); *see also* E-mail from a Swissair employee to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000).

[227] *See DPWN/United* Compl., at 71 and n.335: E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000); *see also* E-mail from a Swissair employee to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000).

[228] *See DPWN/Air Canada* Compl., at 65 and n.317: E-mail from Sales Manager for Germany, Lufthansa Cargo, to Otto Meyer, Air France, Bernd von Seelen, KLM Cargo, and representatives of British Airways and Swissair (Apr. 20, 2000); *see also* E-mail from a Swissair employee to Sales Manager for Germany, Lufthansa Cargo (Apr. 24, 2000).

169.    For example, in May 2000, Air France suspected that KLM and Lufthansa Cargo might have waived the Fuel Surcharge on large shipments.[229]   Accordingly, an Air France Representative wrote to KLM and Lufthansa Cargo, stating "this morning my colleague from France told me that LH [Lufthansa Cargo] and KL[M] are dispensing with the fuel surcharge in France in the case of bigger shipments.  Can you confirm this? This apparently applies to BA [British Airways] and MP [Martinair] as well.  AF [Air France] has charged every shipment to date."[230]  KLM responded that KLM was not engaged in cheating on the Cartel:

> KLM is charging the basic fuel charges in accordance with our Head Office and our responsible regional directors of sales for south Europe.  This is strict KLM policy.  If there were any exceptions, then this took place at the local level and without the knowledge of the responsible directors.  If you should have an example, then please let us know.  We will and want to look into this issue.[231]

170.    A similar exchange took place between KLM and Lufthansa Cargo in August 2000.  On August 25, 2000, Lufthansa Cargo's Sales Manager for Germany wrote to KLM stating that "[i]t was brought to my attention today by my colleagues in the USA that KLM will suspend the fuel-surcharge in the remaining summer months from the USA, aside from the fact that from the east coast freight is being offered for 0.50 USD/kg.  Can you confirm this?"[232]  After investigating the matter, KLM responded to Lufthansa Cargo's Sales Manager for Germany by noting that KLM's "management USA confirms that the fuel surcharges are being applied fully and without exceptions.  The rate of about USD 0.50 mentioned by you is also not

---

[229]    *See DPWN/United* Compl., at 72 and n.337:  E-mail from Otto Meyer, Air France, to Sales Manager for Germany, Lufthansa Cargo, and Bernd von Seelen, KLM Cargo (May 31, 2000) (certified translation).

[230]    *See DPWN/United* Compl., at 72 and n.337:  E-mail from Otto Meyer, Air France, to Sales Manager for Germany, Lufthansa Cargo, and Bernd von Seelen, KLM Cargo (May 31, 2000) (certified translation).

[231]    *See DPWN/United* Compl., at 72 and n.339:  E-mail from Bernd von Seelen, KLM Cargo, to Otto Meyer, Air France, and Sales Manager for Germany, Lufthansa Cargo (June 2, 2000) (certified translation).

[232]    *See DPWN/United* Compl., at 72 and n.340:  E-mail from Sales Manager for Germany, Lufthansa Cargo, to Bernd von Seelen, KLM Cargo (Aug. 25, 2000) (certified translation).

at the KLM level."[233]   KLM informed Lufthansa Cargo's Sales Manager for Germany that KLM's "director 'Americas', Michael Steen, has planned a meeting with [Lufthansa Cargo's Vice President of Sales for The Americas], perhaps the subjects can be broached locally at this talk."[234]   Prior to the planned meeting, Lufthansa Cargo's Vice President of Sales for The Americas contacted KLM to discuss Fuel Surcharges.[235]

171.   A KLM representative also met with two Lufthansa Cargo employees in January 2001, including two additional KLM employees in the meeting.[236]   Lufthansa Cargo expressed the concern that having three representatives from KLM would hinder the purpose of the meeting, which was to have an informal exchange of competitively-sensitive information.[237]   As expressed by one of the Lufthansa Cargo employees, Lufthansa Cargo wanted "to keep the group small, otherwise everyone thinks three times before he says anything and we actually want an information exchange."[238]

---

[233]   See *DPWN/United* Compl., at 72 and n.341, 73 and n.342:  E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 28, 2000) (certified translation); E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 29, 2000) (unofficial translation).

[234]   See *DPWN/United* Compl., at 72 and n.341, 73 and n.342:  E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 28, 2000) (certified translation); E-mail from Bernd von Seelen, KLM Cargo, to Sales Manager for Germany, Lufthansa Cargo (Aug. 29, 2000) (unofficial translation).

[235]   See *DPWN/United* Compl., at 73 and n.344:  E-mail between Lufthansa Cargo employees (Sept. 1, 2000) (unofficial translation).

[236]   See *DPWN/United* Compl., at 73 and n.345:  E-mail from Dror Harel, KLM Cargo, to a Lufthansa Cargo employee (Jan. 3, 2001).

[237]   See *DPWN/United* Compl., at 73 and n.346:  E-mail between Lufthansa Cargo employees (Jan. 8, 2001) (certified translation).

[238]   See *DPWN/United* Compl., at 73 and n.346:  E-mail between Lufthansa Cargo employees (Jan. 8, 2001) (certified translation).

172.    On April 6, 2001, a representative of Turkish Airlines reassured Lufthansa Cargo that it had not been cheating and agreed that "[w]e find it dangerous for all carriers to play with [the Fuel Surcharge]."[239]

173.    In September 2001, British Airways wrote to Cargolux, copying Lufthansa Cargo, to note that

> Our [British Airways'] rate to LAX [Los Angeles International Airport] is 1.90 plus FSC .15 p/k [per kilogram].   On the other hand, as everybody, we are giving spot rate for some of our flights where we have capacity.
>
> You may say that this is not done by you [Cargolux]. . . but I hear the same stories for some airlines.  So why dont [sic] we have a board of managers who will quote [th]e rates for the airlines operating from IST [Atattirk International Airport].  If this is what we are [aft]er, please note BA [British Airways] will not participate.
>
> Pls can you relay this message to the mailing list as my system does not allow to do so. . [240]

Cargolux forwarded the message to other Airfreight Carriers, including a representative from Lufthansa Cargo.[241]   Thus, the Airfreight Carriers monitored each other's net prices and tolerated only limited exceptions to the agreed upon prices.

174.    On May 15, 2002, Lufthansa Cargo and Air France met and discussed measures "undertaken to strictly observe the Fuel Surcharge," as well as capacity issues.[242]

175.    On September 30, 2002, representatives of eight major Airfreight Carriers, including Air France, KLM, and Lufthansa Cargo, met confidentially in Japan to discuss their

---

[239]    *See DPWN/United* Compl., at 73 and n.348:  E-mail from Nasug Cetin, Turkish Airlines (Apr. 9, 2001).

[240]    *See DPWN/United* Compl., at 74 and n.349:  E-mail from Erdogan Artuna, British Airways, to Henry Templin, Cargolux (Apr. 9, 2001).

[241]    *See DPWN/United* Compl., at 74 and n.350:  E-mail from Henry Templin, Cargolux, to representatives of Air France, Lufthansa Cargo and MNG Air Cargo (Apr. 11, 2001).

[242]    *See DPWN/United* Compl., at 74 and n.351:  Notes, Lufthansa Cargo (May 15, 2002) (unofficial translation) (emphasis in original).

"status, plans and views regarding FSC [Fuel Surcharge]."[243]   All eight Airfreight Carriers mutually agreed that there should be "no exceptions . . . . Allowing one exception [would] defeat the whole industrial movement.  This means, of course, no adjustments in net/net rates, either whole or partial."[244]  In addition, the Airfreight Carriers established "[c]lose hotlines . . . with immediate effect among today's participants in case of doubt and contradicting/misleading market information."[245]

176.    In January 2003, an Air France regional manager reassured Lufthansa Cargo that Air France did not discount its Fuel or Security Surcharges.[246]

## DEFENDANTS' AND OTHER AIRFREIGHT CARRIERS'
## GUILTY PLEAS, CRIMINAL FINES, AND CIVIL SETTLEMENTS

177.    To date, twenty (20) Airfreight Carriers have pleaded guilty and paid criminal fines in connection with the DOJ's investigation of the price-fixing Cartel described in this Complaint.  The following chart provides a summary of the guilty pleas entered by Defendants and certain Airfreight Carrier co-conspirators, as well as the fines paid by Defendants, those other Airfreight Carriers, and their respective executives:

---

[243]    *See DPWN/United* Compl., at 74 and n.352:  E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002).

[244]    *See DPWN/United* Compl., at 74 and n.352:  E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002).

[245]    *See DPWN/United* Compl., at 74 and n.352:  E-mail from Toshiyuki Tanaka, Lufthansa Cargo, to several Lufthansa employees (Sept. 30, 2002).

[246]    *See DPWN/United* Compl., at 75 and n.355:  E-mail between Lufthansa Cargo employees (Jan. 24, 2003).

| Carrier | Date | Details |
|---|---|---|
| Aerolinhas Brasileiras S.A. | 12/19/2009 | Carrier pled guilty and paid a joint fine (with LAN Cargo) of $109 million |
| Air France-KLM | 7/22/2008 | Carrier pled guilty and paid a fine of $350 million |
| | 4/26/2011 | An indictment was returned against Marc Boudier, former Executive VP of Air France's Cargo Division, and Jean Charles Foucault, former VP of Air France's Cargo Division of Sales & Marketing |
| All Nippon Airways Co. Ltd. | 12/6/2010 | Carrier pled guilty and paid a fine of $73 million (for price fixing in both the air cargo and air passenger industries) |
| Asiana Airlines Inc. | 5/5/2009 | Carrier pled guilty and paid a $50 million fine (for price fixing in both the air cargo and air passenger industries) |
| British Airways Plc. | 8/23/2007 | Carrier pled guilty and paid a $300 million fine — $100 million for passenger and $200 million for cargo |
| | 11/10/2008 | Keith Packer, a British citizen and former Commercial General Manager for British Airways World Cargo, pled guilty and agreed to an 8 month prison sentence and a $20,000 fine |
| Cargolux Airlines International S.A. | 5/12/2009 | Carrier pled guilty and paid a $119 million fine |
| | 12/8/2011 | Ulrich Ogiermann, President and CEO, and Robert Van de Weg, Senior Vice President of Sales and Marketing, each pled guilty and agreed to a 13 month prison sentence |
| Cathay Pacific Airways Ltd. | 7/22/2008 | Carrier pled guilty and paid a $60 million fine |
| China Airlines Ltd. | 11/3/2010 | Carrier pled guilty and paid a $40 million fine |
| El Al Israel Airlines Ltd. | 2/4/2009 | Carrier pled guilty and paid a $15.7 million fine |
| EVA Airways Corporation | 6/24/2011 | Carrier pled guilty and paid a $13.2 million fine |
| Japan Airlines International Co. Ltd. | 5/7/2008 | Carrier pled guilty and paid a $110 million fine |
| | 11/16/2010 | Takao Fukuchi, former president of JAL Cargo Sales, was indicted — the charges are still pending |
| Korean Air Lines Co. Ltd. | 8/24/2007 | Carrier pled guilty and paid a $300 million fine (for price fixing in both the cargo and passenger industries) |

| Carrier | Date | Details |
|---|---|---|
| LAN Cargo S.A. | 2/19/2009 | Carrier pled guilty and paid a joint fine (with Aerolinhas Brasileiras ) of $109 million |
| Martinair Holland N.V. | 7/22/2008 | Carrier pled guilty and paid a $42 million fine |
| | 6/26/2009 | Franciscus Johannes de Jong, former Vice President of Cargo Sales in Europe, pled guilty and agreed to a $20,000 fine and an 8 month prison sentence |
| | 9/21/2010 | Maria Christina "Meta" Ullings, Senior Vice President of Cargo Sales and Marketing, was indicted — the charges are still pending |
| Nippon Cargo Airlines Co. Ltd. | 5/8/2009 | Carrier pled guilty and paid a $45 million fine |
| | 11/16/2010 | Indictments were returned against Yoshio Kunugi and Naoshige Makino, both former senior executives — the charges are still pending |
| Northwest Airlines LLC | 8/27/2010 | Carrier pled guilty and paid a $38 million fine |
| Polar Air Cargo LLC | 10/15/2010 | Carrier pled guilty and paid a $17.4 million fine |
| Qantas Airways Ltd. | 1/14/2007 | Carrier pled guilty and paid a $61 million fine |
| | 5/15/2008 | Bruch McCaffrey, former Vice President of Freight for the Americas, pled guilty and agreed to serve an 8 month prison sentence and to pay a $20,000 fine. |
| SAS Cargo Group A/S | 7/21/2008 | Carrier pled guilty and paid a $52 million fine |
| | 8/29/2008 | Timothy Pfeil, SAS's former highest-ranking U.S. cargo executive, pled guilty and agreed to serve a 6 month prison sentence and to pay a $20,000 fine. |
| Singapore Airlines | 2/8/2011 | Carrier pled guilty and paid a $48 million fine |

178.    The size of the fines paid by Defendants and these Airfreight Carriers confirms the significant overcharges imposed by Defendants and the other members of the Cartel, for which Defendants are jointly and severally liable.

179.    Further, various Defendants have been fined by the European Commission over Surcharges illegally imposed on Airfreight Customers such as Schenker, between late 1999 and 2006.   According to the EU Competition Commissioner, eleven (11) Airfreight Carriers,

including Defendants Air France-KLM, SAS, Cargolux, and Qantas, "colluded over surcharges for fuel and security during a particularly difficult period for the industry after the terror attacks on the United States on September 11, 2001." The Commissioner stated that "[t]he fact that fuel prices were increasing, or that security costs rose after the 2001 terrorist attacks, is not an acceptable reason to stop competing against each other ... The companies always had an alternative" to collusion despite the difficulties created by the regulatory and economic environment. In addition, the Commission rejected pleas for additional reductions by five Airfreight Carriers, which had argued that they were unable to pay because the size of the fine would have put them out of business."[247]

180.    Air France was fined by the Commission in the amount of EUR 182.9 million; KLM was fined EUR 127.2 million; Martinair was fined EUR 29.5 million; SAS received a penalty of EUR 70.2 million, in part due to the fact that SAS had been also involved in a previous price fixing case; Cargolux was fined EUR 79.9 million; and Qantas was fined EUR 8.8 million. These fines include the reductions under the Commission's Leniency Notice procedures.

181.    In addition to the DOJ and European Commission proceedings, national competition authorities and regulators in Australia, Canada, New Zealand, South Africa, South Korea, and within the European Union itself have investigated the Cartel. These authorities have levied substantial fines on the participating Airfreight Carriers, including Defendants, as each regulator has determined that the respective Defendants engaged in conduct in relation to the imposition of Surcharges on the international carriage of cargo by air that violated applicable anticompetitive statutes.

---

[247]    *See* James Kanter, "*E.U. Fines Airlines over $1 billion in Cargo Cartel*," New York Times, (Nov. 9, 2010).

182.    For example, the Australian Competition and Consumer Commission ("ACCC") instituted proceedings in the Australian Federal Court against Defendants Air France-KLM and Qantas, among others.  The ACCC fined Air France-KLM AUD 3 million, Martinair AUD 5 million, and Qantas AUD 20 million.

183.    In the Canadian proceedings, Qantas, Cargolux, and Air France-KLM admitted their complicity in the global airfreight cartel in proceedings initiated by the Canadian antitrust authority, the Competition Bureau of Canada. The investigations into the other Airfreight Carriers' actions are ongoing. To date, the Airfreight Carriers have agreed to total fines of CAD 172 million, the fine against Qantas alone was CAD 155 million.[248]

184.    On December 15, 2008, New Zealand's Commerce Commission ("NZCC") initiated proceedings in the High Court in Auckland against thirteen (13) Airfreight Carriers and seven (7) of their employees, including senior executives.  To date, Defendants Qantas and Cargolux have admitted their complicity in the global airfreight Cartel and the NZCC has imposed fines of NZD 6.5 million and NZD 6.0 million, respectively.[249]

185.    On May 28, 2010, the KFTC imposed a total fine of 119.54 billion won on nineteen (19) Airfreight Carriers including Air France-KLM, Nippon, Cargolux, and Qantas. The KFTC found those Airfreight Carriers had conspired to introduce Fuel Surcharges and continued to raise Surcharge rates for air cargo to and from Korea between 1999 and 2007.

186.    On August 28, 2013, the Brazilian antitrust authority, Conselho Administrativo de Defesa Econômica ("CADE"), imposed total fines of BRL 293 million against four airfreight companies, including VarigLog, ABSA Aerolineas Brasileiras, American Airlines, and Alitalia for involvement in the global airfreight cartel.  Previously, in February 2013, Air France-KLM

---

[248]    *See* Competition Bureau of Canada, Press Release (Aug. 20, 2013).

[249]    *See* NZCC, Press Release (Sept. 29, 2012).

had paid a total fine of BRL 14 million.  Here again, no fines were imposed against Lufthansa Cargo as it had admitted its involvement in the Cartel and contributed to the exposure of the Cartel.[250]

187.    Thus, regulatory authorities around the globe have all affirmed the conspiratorial and collusive actions of this internationally coordinated Cartel which directly impacted U.S. commerce and Schenker.

188.    In addition, numerous Airfreight Carriers, including Defendants, have entered into individual settlements in the *Air Cargo* Litigation pursuant to which each Airfreight Carrier agreed to pay a significant sum to the *Air Cargo* Litigation Class and to cooperate with the *Air Cargo Litigation* plaintiffs in their pursuit of their antitrust claims against the non-settling defendants who were engaged in the same antitrust conspiracy involving U.S. Airfreight Shipping Services alleged herein.  With regard to Defendants specifically, Air France-KLM agreed to pay the *Air Cargo* Litigation Class USD 87 million, Cargolux paid USD 35.1 million, Qantas paid USD 26.5 million, SAS paid USD 13.93 million, and Nippon paid USD 10.4 million.

189.    In Canada, class action lawsuits were also filed against a total of twenty-three (23) Airfreight Carriers, including various Defendants named herein.  As in the *Air Cargo* Litigation, co-conspirator Lufthansa Cargo was the first defendant in that lawsuit to reach a settlement, agreeing in 2006 to pay that class of plaintiffs CAD 5.338 million.  A settlement was reached with SAS in 2010, pursuant to which it paid CAD 300,000, and separate settlements were reached in 2011 with Qantas, Cargolux, and Air France-KLM, pursuant to which they paid CAD 237,000, CAD 1.8 million, and CAD 6.5 million, respectively.

---

[250]    *See* CADE, Press Release (Aug. 28, 2013).

## **FRAUDULENT CONCEALMENT**

190.    Throughout the Relevant Period, Defendants and their co-conspirators affirmatively, fraudulently and successfully concealed their unlawful, price-fixing conduct against Schenker.   In addition, Defendants and their co-conspirators took steps to actively conceal the Cartel.  During the course of the Cartel and thereafter, Defendants and other Cartel members represented to Schenker that its Fuel and Security Surcharges were intended to, and necessary to, cover increasing fuel and security related costs.    Moreover, Defendant's Surcharges appeared to be consistent with public events.

191.    Schenker did not discover and could not have discovered, through the exercise of reasonable diligence, which Schenker in fact exercised, the existence of the conspiracy alleged herein until February 2006 at the earliest, when the investigations of the DOJ and foreign antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their conspiracy.   On information and belief, the conspiracy continued well after February 2006, as Defendants and other Airfreight Carriers continued to secretly conspire to fix the Surcharges.

192.    Because Defendants' conspiracy was actively concealed, Schenker was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for U.S. Airfreight Shipping Services.

193.    The affirmative acts of Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

194.   Defendants and their co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

195.   Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of U.S. Airfreight Shipping Services so as to avoid detection.

196.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

197.   Defendants and their co-conspirators gave false and pretextual reasons for their Surcharges during the Relevant Period.

198.   Each of Defendants' Fuel and Security Surcharge announcements during the Relevant Period constituted implicit statements that the Surcharges in question were legitimate and the result of legitimate competitive market forces.  Surcharges for U.S. Airfreight Shipping Services before the Relevant Period had occurred and were publicly reported in press releases, news wire services, trade publications, and newspapers.  Schenker was thus conditioned by experience in dealing with Defendants in what Schenker believed to be a competitive industry to expect such Surcharges from time to time.  However, any Surcharge that was openly collusive would not have been tolerated by Schenker.

199.   The Surcharges in question announced by Defendants and reported in public sources were consistently ascribed by Defendants and their co-conspirators to normal market forces and considerations, including increases in costs.  Schenker also did not have and could not have had contemporaneous access to sufficient information regarding Defendants' costs and thus had to rely on the truthfulness of Defendants' purported cost justifications.  Specifically, Schenker was unaware of Defendant's actual fuel costs relating to air cargo which are

determined by such factors as long-term contracts and hedging strategies, none of which was publicly available.  Moreover, the timing of Defendant's Fuel Surcharges was directionally consistent with increases in the spot price of fuel throughout the Relevant Period.

200.   For example, KLM and Air France each issued press releases during the Relevant Period announcing Fuel Surcharge increases purportedly on the basis of rising costs. None of the releases disclosed the collusive mechanism used to set those Surcharges.  On information and belief, examples of such press releases could in the past  be found at http://www.klmcargo.com/tds/frameset.jsp?http&&&www.klmcargo.com/tds//newspage/news/ KLMCargoadaptsfuelsurchargemechanismandincreasesfuelsurchargetoEuro035.jsp?Component ID=58583&SourcePageID=9062>, <http://www.airfranceklm-finance.com/sysmodules/RBS_fichier/admin/forcedownload.php?id= 375 - >, and <www.af-klm.com/cargo/b2b/cargo_en/images/FSC%20AFKL%20-%200,50%20 English 060131 tcm230-41568.pdf >.

201.   Cargolux's website also has a page tying fuel Surcharges to upward or downward fuel costs, which does not disclose the conspiratorial nature of the mechanism for setting the Surcharges.  On information and belief, this web page could in the past be found at <http://www.cargolux.com/services/surcharges_details.php>.

202.   Likewise, SAS attributed Security Surcharges primarily to cost factors without identifying the conspiracy relating to it.  On information and belief, the website devoted to this topic could in the past be found at <http://www.sascargo.com/default.asp?NavID=2272>.

203.   Similar pretextual announcements have been made during the Relevant Period by other Cartel members.   On information and belief, this includes, for example, Singapore Airlines                              (formerly                              located                              at

<http://www.findarticles.com/p/articles/mi_mOCWU/is_2005_July_8/ai_n14729796>),

Alitalia (<http://www.rte.ie/business/2005/0711/altalia.html>),   Lufthansa   Cargo   (formerly

located   at   <http://findarticles.com/p/articles/mi_mOCWU/is_2005_Sept_16/ai_n15397423>),

and Japan Airlines (http://www.jal.co.jp/en/other/info2006_0714.html).   These are only a few

examples among many.

204.   These false or misleading explanations for the Fuel and Security Surcharges

lulled Schenker into believing that increases were the normal result of competitive market

forces rather than the product of collusive efforts.   The statements of Defendants and the other

co-conspirators of the Cartel about the reasons for such Surcharges were designed to, and in fact

did, put Schenker off guard and caused Schenker to accept the increases without undertaking

further inquiry.   Even had such inquiry been undertaken, it would have proven futile, because

Schenker did not have access to contemporaneous information that would have allowed it to

evaluate whether each Defendant's claimed justifications for Surcharges were valid.

205.   At the time, Schenker considered Defendants' stated reasons for their Surcharges

to be both normal and legitimate.   Accordingly, a reasonable person under the circumstances

would not have been alerted to investigate the legitimacy of Defendants' Surcharges.

206.   Schenker could not have discovered the alleged conspiracy at an earlier date by

the exercise of reasonable diligence because of the deceptive practices and techniques of

secrecy employed by Defendants and their co-conspirators to avoid detection of, and

fraudulently conceal, their contract, conspiracy or combination.   The conspiracy as herein

alleged was fraudulently concealed by Defendants by various means and methods, including,

but not limited to, secret meetings, misrepresentations to customers concerning the reason for

price increases and surreptitious communications among Defendants by the use of the telephone

or in-person meetings at trade association gatherings and elsewhere in order to prevent the existence of written records.

207.   For example, pursuant to the Cartel, Defendants and other Airfreight Carriers fraudulently concealed the Cartel to the benefit of all the participants in the Cartel, including Defendants:

a.   A July 25, 2001, Lufthansa Cargo email discussing a meeting with Cargolux in furtherance of the Cartel warned "Confidential . . . . Please do not use externally."[251]

b.   On September 30, 2002, representatives of eight major Airfreight Carriers, including certain Defendants, "met confidentially' to exchange their "status, plans, and views regarding FSC."[252]

c.   Members of the BLACKS initiative, including Defendants Air France and KLM, "agreed [on the] confidentiality of meetings/group existence [sic]."[253]

d.   A February 26, 2004, Lufthansa Cargo email regarding discussion of rates with rival carriers stated, "THIS MESSAGE IS STRICTLY CONFIDENTIAL, AND IS NOT INTENDED FOR DISTRIBUTION OR FORWARDING."[254]

e.   A May 19, 2004 e-mail between Lufthansa Cargo employees regarding the Cartel contains the notation "please delete."[255]

---

[251]   *See DPWN/United* Compl., at 81 and n.371:  E-mail between Lufthansa Cargo employees (July 25, 2001) (emphasis in original).

[252]   *See DPWN/United* Compl., at 81 and n.372:  E-mail between Lufthansa Cargo employees (Sept. 30, 2002).

[253]   *See DPWN/United* Compl., at 82 and n.373:  E-mail between Lufthansa Cargo employees (Nov. 22, 2004).

[254]   *See DPWN/United* Compl., at 82 and n.374:  E-mail between Lufthansa Cargo employees (Feb. 26, 2004).

[255]   *See DPWN/United* Compl., at 82 and n.375:  E-mail between Lufthansa Cargo employees (May 19, 2004).

208.    Each of the Cartel members' Surcharge announcements during the Relevant Period constituted an implicit, if not explicit, representation that the Surcharges in question were unilaterally imposed in response to competitive market forces.  Moreover, Defendants and the other Cartel members staggered the dates when they each increased their prices pursuant to the Cartel.  This had the effect of misleading Schenker to believe that each Cartel member was reacting unilaterally to a common stimulus – higher fuel and security costs.

209.    Further, Schenker was unable to detect the actions of Defendants and the Cartel by examining Fuel Surcharges, spot market prices, or Fuel Price Indexes because none of those numbers reflects any Air Carrier's actual fuel or security costs, net of hedging strategies and after allocating fuel costs between passenger and cargo on planes that carry both passengers and cargo.

210.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Schenker had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

211.    None of the facts or information available to Schenker could or would have led to the discovery of the conspiracy alleged herein prior to the investigations of the DOJ and foreign antitrust regulators being publicly disclosed.  For example, the Commission announced in November 2010 its finding that the Airfreight Carriers had "coordinated various elements of [Surcharges] for a period of over six years from December 1999 to 14 February 2006."[256] Moreover, on information and belief, the Cartel's coordinated, collusive, and fraudulently concealed imposition of the Surcharges lasted well beyond February 2006.

---

[256]    *See* Press Release, *Antitrust Commission fines 11 air cargo carriers €799 million in price fixing cartel*, IP/10/1487 (Nov. 9, 2010).

212.    Defendants never disclosed their participation in the Cartel during the Relevant Period and never took any public action to end their involvement in the Cartel.  Further, Schenker did not have and could not have had contemporaneous access to sufficient information regarding Defendants' and the Cartel's costs and thus had to rely on the truthfulness of the Cartel's purported and public justifications.

213.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Schenker based on the anticompetitive conduct alleged in this Complaint.  Moreover, the statute of limitations was further tolled as to Schenker due to filing of the pending *Air Cargo* Litigation.

214.    On October 21, 2010, Schenker received notice of proposed settlements in the *Air Cargo* Litigation between the *Air Cargo* Class and Defendants Air France-KLM and SAS. In accordance with the terms of that notice, Schenker opted out of those settlements on January 18, 2011.  On March 14, 2011, Schenker received notice of proposed settlements in the *Air Cargo* Litigation between the *Air Cargo* Class and Defendants Cargolux, Qantas, and Nippon. Schenker opted out of those settlements in accordance with the terms of that notice on May 24, 2011.

**INJURY IN FACT, ANTITRUST INJURY, AND DAMAGES**

215.    As a direct and proximate result of Defendants' and their co-conspirators' unlawful conduct and the unlawful conspiracy alleged herein, Schenker has been injured in its business and property and has suffered antitrust injury and damage thereto.  Schenker is a consumer of the U.S. Shipping Services offered by Defendants and the other members of the Cartel that were subject to the illegal price-fixing conspiracy alleged herein.  Schenker's antitrust injuries flow directly from the unlawful price-fixing agreements and conspiracy between Defendants and their co-conspirators and Schenker's injuries flow from that which

makes Defendants' conduct unlawful. Specifically, Schenker's injuries flow directly from the unlawful price-fixing agreements and conspiracy between Defendants and their co-conspirators to:

   a.   Fix prices for U.S. Airfreight Shipping Services, including Fuel Surcharges and Security Surcharges, at supracompetitive levels;

   b.   Diminish and/or eliminate free and open competition for the sale of U.S. Airfreight Shipping Services to Schenker and other Airfreight Customers.

   c.   Refuse to provide contractually agreed upon incentive rebates or discounts to Schenker, with respect to Fire and Security Surcharges.

   216.   But for Defendants' and their co-conspirators' continuing Cartel activity, prices for U.S. Airfreight Shipping Services would not have remained at supracompetitive levels for as long as they did; rather, they would have returned much more quickly to competitive levels.

## COUNT I
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### Injury to Schenker

   217.   Schenker incorporates by reference as if fully set forth herein the allegations contained in Paragraphs 1 through 216 of this Complaint.

   218.   During the Relevant Period, Defendants participated in a global Cartel, and pursuant to that Cartel fixed the aforementioned Fuel and Security Surcharges and Base Rates for U.S. Airfreight Shipping Services and concertedly refused to include Fuel and Security Surcharges revenues in any incentive, rebate, or discount program.

   219.   Defendants, through their officers and employees, including high-level personnel of Defendants' cargo and regional divisions, participated in a conspiracy with one or more other members of the Cartel which provided U.S. Airfreight Shipping Services, a primary purpose of

which was to suppress and eliminate competition by fixing one or more components of the prices charged to Airfreight Customers, such as Schenker for U.S. Airfreight Shipping Services.

220.   In furtherance of the conspiracy, Defendants, through their officers and employees, engaged in discussions and attended meetings with representatives of one or more Cartel members which provided U.S. Airfreight Shipping Services.  During these discussions and meetings, agreements were reached to fix one or more components of the prices to be charged to Airfreight Customers such as Schenker which purchased U.S. Airfreight Shipping Services during the Relevant Period.

221.   Defendants participated in numerous overt acts in furtherance of the Cartel, as itemized in detail in the prior Sections of this Complaint, including engaging in communications regarding and reaching agreements as to the prices to be charged for U.S. Airfreight Shipping Services.

222.   At no time during the Relevant Period did Defendants withdraw from the Cartel.

223.   Defendants' anticompetitive conduct, as described above, constitutes a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

224.   Defendants' anticompetitive conduct, as described above, constitutes an unreasonable restraint of trade under the Rule of Reason in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

225.   Defendants' unlawful conduct had a direct and substantial adverse effect on U.S. commerce, harming U.S. consumers, including Schenker, by increasing their costs and thereby reducing the output of U.S. commerce.

226.   As a direct and proximate result of Defendants' unlawful conduct and the unlawful conspiracy alleged herein, Schenker has suffered injury and damage to its business and

property.  Schenker's injuries flow directly from the anticompetitive effects of the unlawful price-fixing agreements between Defendants and their co-conspirators on U.S. commerce. Defendants are jointly and severally liable for both the illegal overcharges of each other, and for the overcharges of the other members of the Cartel from which Schenker purchased U.S. Airfreight Shipping Services.

227.    The combination and conspiracy alleged herein had the following effects, among others:

a.      The prices charged by Defendants to, and paid by, Schenker for U.S. Airfreight Shipping Services were fixed, raised, maintained, or stabilized at artificially high and non-competitive levels;

b.      Schenker has been deprived of free and open competition in the purchase of U.S. Airfreight Shipping Services in the United States;

c.      Schenker was required to pay more for U.S. Airfreight Shipping Services in the United States than it would have paid in an competitive marketplace absent Defendants' and the Cartel's price-fixing conspiracy and was overcharged on its purchases from Defendants and the Cartel; and

d.      Competition in the sale of U.S. Airfreight Shipping Services has been wrongfully restrained, suppressed, or eliminated.

228.    During the Relevant Period, Defendants' U.S. Airfreight Shipping Services conspiracy as described herein caused Schenker to pay artificially inflated prices for U.S. Airfreight Shipping Services it would not have paid absent such violations.  As a result, Schenker has been injured and damaged in its business and property in an amount to be determined according to proof.

229.   As a direct and proximate result of Defendants' illegal conspiracy, as described herein, Schenker has been injured and financially damaged in its respective businesses and property, in that it has have paid artificially inflated prices during the Relevant  Period that it would not have paid in the absence of the illegal conspiracy.

**Violations Alleged**

230.   During the Relevant Period, the exact dates being unknown to Schenker, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of Base Rates and Surcharges relating to U.S. Airfreight Shipping Services, and to refuse to include Surcharges in any incentive, rebate, or discount program, and to concertedly impose Surcharges based on actual freight, in the United States and throughout the world through the means described in this Complaint, all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

231.   In formulating and effectuating the alleged contract, combination, or conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the prices of U.S. Airfreight Shipping Services.

232.   During the Relevant  Period, Defendants sold U.S. Airfreight Shipping Services in a continuous and uninterrupted flow of interstate and foreign commerce.   Defendants received payment for such products across state and national boundaries.   Defendants' activities, and the sale of their services, have both taken place within, and have had a substantial anticompetitive effect upon, interstate commerce within the United States and foreign commerce.

233.   Schenker seeks treble damages for its injuries, injunctive relief, its reasonable attorneys' fees and costs, and any such other relief that the Court deems necessary and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Schenker prays that the Court:

A.      Declare that the contract, combination, and conspiracy alleged herein is an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act;

B.      Order that Defendants and each of the Defendants' successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining, or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

C.      Award Schenker the damages it sustained and suffered as a result of the illegal, anticompetitive conduct alleged herein, including joint and several damages, and for the statutory trebling of all such damages as permitted under the antitrust laws;

D.      Award Schenker its reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest, to the fullest extent permitted by law; and

   E.     Award Schenker such other and further relief as the Court deems necessary and

appropriate.

Dated:  New York, New York
        August 7, 2014


                        Respectfully submitted,




                        By: *James J. Calder*
                        James J. Calder

                        KATTEN MUCHIN ROSENMAN LLP
                        575 Madison Avenue
                        New York, NY  10022-2585
                        Telephone: 212.940.8800
                        Email:       james.calder@kattenlaw.com


                        Sheldon T. Zenner (motion for admission *pro hac vice*
                         to be filed )
                        Mary Ellen Hennessy (motion for admission *pro hac
                        vice* to be filed )
                        KATTEN MUCHIN ROSENMAN LLP
                        525 West Monroe Street
                        Chicago, Illinois 60661-3693
                        Telephone: 312.902.5200
                        Facsimile: 312.902.1061
                        Email:       sheldon.zenner@kattenlaw.com
                                     maryellen.hennessy@kattenlaw.com

                        *Attorneys for Schenker AG*

92